**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

DONALD DRAUGHON,

      Plaintiff,

      v.                              Case No. 14-2264-JAR-GLR

UNITED STATES OF AMERICA,

      Defendant.

## MEMORANDUM AND ORDER

Plaintiff Donald Draughon brings this Federal Tort Claims Act ("FTCA") wrongful death action against the United States of America, alleging the Veterans Health Administration was negligent in its treatment of his son William Draughon's ("William") posttraumatic stress disorder ("PTSD") and other mental health issues, which ultimately led to his suicide. This matter is before the Court on the Government's Motion for Summary Judgment (Doc. 130), the Government's Motion to Exclude Testimony Pursuant to *Daubert* (Doc. 132), and Plaintiff's Motion for Leave to File Sur-reply (Doc. 143). These motions are fully briefed and the Court is prepared to rule. As described more fully below, the Government's motions to exclude and for summary judgment are denied. Plaintiff's motion for leave to file a surreply is granted.

## I.     Motion to Exclude Plaintiff's Expert Opinions on Causation

### A.     Legal Standard

The Court has broad discretion in deciding whether to admit expert testimony.[1] Generally,

---

[1] *Kieffer v. Weston Land, Inc.*, 90 F.3d 1496, 1499 (10th Cir. 1996).

> A witness who is qualified as an expert by knowledge, skill,
> experience, training, or education may testify in the form of an
> opinion or otherwise if:
>
> (a)    the expert's scientific, technical, or other specialized
> knowledge will help the trier of fact to understand the
> evidence or to determine a fact in issue;
>
> (b)    the testimony is based on sufficient facts or data;
>
> (c)    the testimony is the product of reliable principles and
> methods; and
>
> (d)    the expert has reliably applied the principles and methods
> to the facts of the case.[2]

The proponent of expert testimony must show "a grounding in the methods and procedures of science which must be based on actual knowledge and not subjective belief or unaccepted speculation."[3]

In order to determine whether an expert opinion is admissible, the Court performs a two-step analysis. "[A] district court must [first] determine if the expert's proffered testimony . . . has 'a reliable basis in the knowledge and experience of his discipline.'"[4] To determine reliability, the Court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid."[5] Second, the district court must further inquire into whether the proposed testimony is sufficiently "relevant to the task at hand."[6] An expert opinion "must be based on facts which enable [him] to express a reasonably accurate conclusion as opposed to conjecture or speculation . . . absolute certainty is not required."[7] And it is not necessary to prove that the expert is "indisputably correct," but only that the "method employed by the expert

---

[2]Fed. R. Evid. 702.

[3]*Mitchell v. Gencorp Inc.*, 165 F.3d 778, 780 (10th Cir. 1999).

[4]*Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 884 (10th Cir. 2005) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592 (1993)).

[5]*BG Tech., Inc. v. Ensil Int'l Corp.*, 464 F. App'x 689, 703 (10th Cir. 2012).

[6]*Id.* (quoting *Daubert*, 509 U.S. at 597).

[7]*Dodge v. Cotter Corp.*, 328 F.3d 1212, 1222 (10th Cir. 2003).

in reaching the conclusion is scientifically sound and that the opinion is based on facts which satisfy Rule 702's reliability requirements."[8]

Daubert sets forth a non-exhaustive list of four factors that the trial court may consider when conducting its inquiry under Rule 702: (1) whether the theory used can be and has been tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) general acceptance in the scientific community.[9] But "the gatekeeping inquiry must be tied to the facts of a particular case."[10]

It is within the discretion of the trial court to determine how to perform its gatekeeping function under Daubert.[11] The most common method for fulfilling this function is a Daubert hearing, although it is not specifically mandated.[12] In this case, the parties have not requested a hearing. The Daubert issues have been fully and thoroughly briefed by the parties. The Court has carefully reviewed the extensive exhibits filed with the motions, including the written reports submitted by the experts, and finds this review is sufficient to render a decision without conducting an evidentiary hearing.

**B.    Discussion**

The Government moves to exclude the causation opinions of three experts offered by Plaintiff in opposition to summary judgment: Lawrence Amsel, M.D.; Michael H. Allen, M.D.; and Steven E. Bruce, Ph.D. The Government does not challenge the qualifications of these experts, nor the relevance of their opinions. The Government objects that their opinions are

---

[8]*Id.*

[9]*Daubert*, 509 U.S. at 593–94.

[10]*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150 (1998) (quotations omitted).

[11]*Goebel v. Denver & Rio Grande W. R.R.*, 215 F.3d 1083, 1087 (10th Cir. 2000); *Roco, Inc. v. EOG Res., Inc.*, No. 14-1065-JAR, 2016 WL 6610896, at *8 (D. Kan. Nov. 9, 2016).

[12]*Goebel*, 215 F.3d at 1087.

conclusory and thus fail to meet the reliability standards under Rule 702 and *Daubert*. The Government maintains that because there were no facts or data presented to these experts about the period between January 2010, when William was last discharged from the VA, and March 2010, when William's suicide occurred, their opinions on causation are "conclusory *ipse dixit*."

Under Missouri law, to demonstrate causation in a wrongful death case, "a plaintiff must show that the negligence of the defendant 'directly caused' or 'directly contributed to cause' the patient's death."[13] In the context of suicide, Plaintiff must be able to offer evidence of proximate causation—that "suicide was 'the natural and probable consequence' of the injury he suffered at the hands of the defendant."[14] Such evidence will require expert testimony if there is no other direct evidence of causation presented.[15] If Plaintiff produces evidence "that the suicide resulted from the injury, the claim then can be submitted to the jury to decide as a question of fact, whether the suicide is a direct result of the defendant's negligence."[16] As described below, the Court finds that each of Plaintiff's three expert opinions on causation are admissible under Rule 702 and *Daubert*.

## 1. Dr. Amsel

Dr. Amsel is a medical doctor licensed to practice in New York, and is board certified in psychiatry. He teaches clinical psychiatry at Columbia University, is a research psychiatrist at New York State Psychiatric Institute, and is an attending psychiatrist at New York Presbyterian Hospital. He is familiar with the standards of care at VA Hospitals, particularly those for

---

[13]*Kivland v. Columbia Orthopaedic Grp., LLP*, 331 S.W.3d 299, 306 (Mo. 2011) (en banc) (quoting *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 865 (Mo. 1993) (en banc) (alterations omitted)). This Court previously determined that Missouri law applies in this case. *See* Doc. 33.

[14]*Kivland*, 331 S.W.3d at 309 (quoting *Callahan*, 863 S.W.2d at 865).

[15]*Id.*

[16]*Id.* at 310.

treatment of PTSD in veterans, and for the prevention of suicide. The Court finds Dr. Amsel is qualified to render an opinion on the applicable standard of care, and on causation in this matter.

Dr. Amsel reviewed William's VA medical records from February 25, 2005 through January 7, 2010—the last time he attended an appointment there. Dr. Amsel spends seven pages of his report reciting these medical records, and explaining the areas in which he believes the VA failed to meet the applicable standard of care in treating William. He then itemizes ten ways in which he believes the VA deviated from the standard of care in treating William. Only after this lengthy recitation does Dr. Amsel opine on causation:

> Based upon my review of the foregoing medical records, it is my opinion (expressed with a reasonable degree of medical certainty) that the VA deviated from and fell below the acceptable standard of care in its treatment of William Paul Draughon. It is my opinion that more likely than not, within a reasonable degree of medical certainty, William Paul Draughon's deteriorated condition and suicide were the direct result of the VA's failure as aforesaid.[17]

The parties dispute whether Dr. Amsel's opinion is "based on sufficient facts or data and is the product of reliable principles and methods, and if the principles and methods have been applied reliably to the facts of the case."[18] The Government maintains that Dr. Amsel fails to explain the basis for his opinion that William's condition deteriorated after he was treated by the VA in January 2010, and that he fails to take into account any of the fact-witness depositions describing events on March 17 and 18. In order to meet the necessary causation standard under Missouri law, Plaintiff need only show that William's suicide was a probable and natural consequence of the VA's negligence. After going through five years' worth of VA medical records, Dr. Amsel explained the myriad ways in which he believes, within a reasonable degree

---

[17]Doc. 133-2, Amsel Op. at 9.

[18]*Blanchard v. Eli Lilly & Co.*, 207 F. Supp. 2d 308, 317 (D. Vt. 2002) (discussing how to assess psychiatric expert testimony under *Daubert*).

of medical certainty, the VA fell below the standard of care in its treatment of William's PTSD. Included in these deviations are (1) the VA's decision to lower William's suicide risk level in December 2009 with no explanation, and (2) its failure to monitor William after he completed an addiction recovery program through the VA, in violation of VA policy. The Court finds that Dr. Amsel is qualified to render an opinion that the VA's failure to meet the standard of care required to treat William's PTSD proximately caused his suicide, based on his review of the medical records. While it is true that Dr. Amsel did not review the deposition testimony from fact witnesses about the events immediately preceding William's March 18, 2010 suicide, this is a gap that goes to the weight and not the admissibility of his testimony.

### 2. Dr. Allen

Dr. Allen is a medical doctor who is board certified in psychiatry, and was previously board certified in addictions. He is a Professor of Psychiatry and Emergency Medicine at the University of Colorado School of Medicine, an attending physician at the Colorado Depression Center, a consultant at the University of Colorado Hospital, and Medical Director of Rocky Mountain Crisis Partners. He has worked extensively with suicidal patients, performing research and developing guidelines for suicide screening. He is currently involved in a study of suicide screening in military hospitals through Denver's VA Mental Illness Research Educational and Clinical Center. The Court has reviewed Dr. Allen's credentials and finds that he is qualified to render an opinion in this case on the applicable standard of care, and on the cause of William's suicide.

Similar to its objection to Dr. Amsel's opinion, the Government argues that Dr. Allen's opinion cannot be evaluated for reliability because he fails to explain the premise for his conclusion that William's condition deteriorated before his suicide, and because he fails to

discuss events that occurred on March 17 and 18, 2010, immediately preceding the suicide. The Government also objects to Dr. Allen's rebuttal report to its own expert, Christopher Ticknor, M.D., and to his supplemental report addressing one of the VA provider's deposition testimony.

As to Dr. Allen's primary report, the Court finds that the Government's objections must be overruled and denied for the same reasons explained as to Dr. Amsel. Similar to Dr. Amsel's report, Dr. Allen explains in detail how William's medical records reveal breaches of the standard of care that should have applied to his treatment, with a particular focus on his treatment in late 2009 and early 2010. And like Dr. Amsel, Dr. Allen identified several ways in which the VA failed to properly address William's PTSD, and assess and treat his suicide risk. Dr. Allen echoed Dr. Amsel's assessment that the VA's decision to reduce William's suicide risk assessment in December 2009 was not supported by the medical evidence, causing a reduction in services and treatment during the critical transition time after completing residential substance abuse treatment. Dr. Allen also opines that the VA was separately obligated to perform outreach to William when he missed appointments, which was not sufficiently performed by VA professionals in this case. Dr. Allen opines that these failures caused his condition to deteriorate. Dr. Allen reviewed Corey Draughon's deposition transcript, William's brother who was present on the date of his suicide, and the police reports from the night of the suicide. To the extent the Government contends that Dr. Allen's opinion is not credible because it does not sufficiently take into account evidence about William's condition in March 2010, that is an issue of weight over admissibility, which the trier of fact is entitled to determine.

Dr. Allen's rebuttal report addresses specific opinions rendered by the Government's expert Dr. Ticknor. The Government argues that Dr. Allen's rebuttal opinion is unreliable on two grounds: (1) Dr. Allen's contention that William exhibited PTSD symptoms at the time of

his death is not based on any reference to facts in the record; and (2) Dr. Allen fails to support his conclusion that although a "precipitant" was involved in William's suicide, it alone would not have caused William's suicide.

In paragraph 2 of Dr. Ticknor's report, he sets forth the basis for his opinion that the VA's treatment of William did not cause his death. One of the grounds for this opinion is that the records he reviewed are devoid of any mention that William exhibited symptoms of PTSD or depression on the day or night of his suicide. He opines that the last evidence of suicidal thoughts is from October 2009. Dr. Allen reached a different causation opinion in his primary report, which this Court has already determined to be admissible. In the rebuttal report, Dr. Allen challenges Dr. Ticknor's focus on the time period immediately preceding William's death. Dr. Allen contends that Dr. Ticknor

> uses the absence of evidence from unqualified lay people to assert that Mr. Draughon was asymptomatic at the moment of his death. This speciously would require that only symptoms occurring at a given moment in time contribute. It would further require a level of expertise and opportunity to examine Mr. Draughon that lay people in his environs could not possess.[19]

The Government objects to this opinion, arguing that Dr. Allen provides "no apparent discussion of causation, nor any explicit statements about the events of March 18, 2010." The Government also objects that Dr. Allen fails to explain what symptoms he believed were occurring, and how those symptoms resulted from a breach of the standard of care. But, as already discussed, Dr. Allen extensively explained his opinion in his initial expert report. His rebuttal report consistently criticizes Dr. Ticknor for evaluating William's symptoms only immediately preceding his death. Dr. Allen's opinion, in contrast, is that William's medical records evidence a longstanding battle with PTSD and depression that were aggravated by alcohol dependence.

---

[19]Doc. 133-4, Allen Rebuttal Op. at 3.

He opines that William's suicide risk level was reduced in contravention of VA guidelines, leading to his discharge with inadequate preparation and follow-up. Dr. Allen opines that these failures led to William's alcohol relapse and aggravated his suicide risk. The Court finds that these opinions are sufficiently reliable to be admissible, and that the Government's objections go to the weight and not the admissibility of his opinion.

In paragraph 3 of Dr. Ticknor's report, he opines that "[a]lcohol abuse and long-standing impulsivity were the causes of Will Draughon's death, and not a failure by doctors and staff at the VA Healthcare System to treat Mr. Draughon's depression and PTSD."[20] Dr. Ticknor sets forth in this paragraph several reasons for his opinion, calling William's "conscious, deliberate relapse of alcohol abuse . . . coupled with an accusation from his girlfriend . . . that [he] was cheating on her" as "precipitating factors."[21] Dr. Ticknor maintains William's alcohol dependence was independent from his PTSD and depression; he disagrees with Dr. Amsel and Dr. Allen's opinions that William's alcohol dependence was related to his PTSD and was used as a form of self-medication. He further contends that the level of alcohol in William's system at the time of his death evidences a conscious decision not to comply with the medical recommendation of abstaining from alcohol.

The second portion of Dr. Allen's rebuttal opinion challenged by the Government rebuts this paragraph of Dr. Ticknor's opinion, and therefore must be viewed in that context. Dr. Allen contends that Dr. Ticknor's opinion that William's alcohol dependence is unrelated to his PTSD and depression is not supported by the evidence or by the VA's own standards for treatment. He explains:

---

[20]Doc. 138-4, Ticknor Op. at 13.

[21]*Id.*

His evidence for this again is simply statements by lay witnesses. He should produce a methodology for his assertion that "Mr. Draughon was alcoholic independently of allegedly self-medicating depression or PTSD". The fact that Mr. Draughon was alcoholic is uncontroverted so repeated evidence on this point simply reinforces the perception of Dr. Ticknor's bias.

The fact that there was a precipitant is also uncontroverted and unsurprising. Precipitants can do [sic] interact with any and all disposing conditions but precipitants alone are insufficient to result in suicide or the suicide rate would clearly be much higher. Reciting Mr. Draughon's relationship history would actually seem to undercut Dr. Ticknor's argument that this disruption would be sufficient to cause a fatal attempt. But again, whatever Mr. Draughon's history, it was or should have been known to the VA and understood as another potential risk factor in a high risk individual.[22]

The Court has reviewed Dr. Allen's primary report, Dr. Ticknor's report, and Dr. Allen's rebuttal report and finds that his rebuttal report on this point has sufficient indicia of reliability. It is clear from the context of his report's response to Dr. Ticknor's assertions that Dr. Allen's precipitant reference is to Dr. Ticknor's discussion in paragraph 3 of his report to "precipitating factors": i.e. William's use of alcohol coupled with the argument with his girlfriend on the night of his suicide. Dr. Allen sufficiently explains throughout his primary report, as well as the rebuttal report, that in his experience, and according to VA guidelines, alcohol dependence in a case like William's is related to his PTSD and depression, and that the combination of these factors, which he contends were inappropriately treated, led to William's suicide.

Dr. Allen submitted a supplemental report addressing deposition testimony of George Dent, Ph.D., who testified that he had telephonic contact with William after his discharge when William failed to contact him for a follow-up appointment. The Government argues that Dr. Allen's supplemental report is flawed because although "Dr. Allen explains what he felt was

---

[22]Doc. 133-4, Allen Rebuttal Op. at 3.

wrong with this call . . . he never even attempts to explain how or why it caused William's suicide." But Dr. Allen's supplemental report, by its terms, was not intended to address how this call caused William's suicide. It was "intended to cover only the deposition of Dr. Dent." Dr. Allen explained how the phone call Dr. Dent discussed in his deposition did not change Dr. Allen's opinion that the VA failed to meet the standard of care required for follow-up of suicidal patients who miss appointments. The Court declines to exclude Dr. Allen's supplemental opinion.

In sum, the Court finds that Dr. Allen's opinions have a reliable basis in the knowledge and experience of the psychiatry profession, and specifically psychiatrists who specialize in suicide screening and prevention. The Government's objections to Dr. Allen's opinions are classic weight over admissibility challenges, and are thus denied. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."[23]

### C.     Dr. Bruce

Steven E. Bruce, Ph.D. is a licensed clinical psychologist who is Director at the Center for Trauma Recovery, Director of Clinical Training, and Associate Professor of Psychological Services at the University of Missouri-St. Louis. The Court finds that he is qualified to render an opinion on the issues of standard of care and causation in this case. The Government challenges Dr. Bruce's expert and rebuttal reports on the same ground discussed above with reference to Dr. Amsel and Dr. Allen. It contends that Dr. Bruce's opinion lacks reliability because it fails to connect the alleged breaches of the standard of care he identifies with William's suicide. The Government provides a one-paragraph quotation summarizing Dr. Bruce's causation opinion,

---

[23]*Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993).

and makes the conclusory and incorrect assertion that he fails to explain or discuss the basis for his causation opinion. But Dr. Bruce has provided an extensive report that explains the basis for his standard of care and causation opinions. He reviewed William's medical records, VA practice guidelines and other VA documents, as well as some deposition testimony. He reaches similar conclusions as Dr. Amsel and Dr. Allen—that the VA did not adhere to its own policies and standards in treating William's PTSD and alcohol dependence. Significantly, Dr. Bruce identifies an error in William's PTSD checklist assessment one week prior to his discharge from the December inpatient treatment. He opines that the decision to discharge William may have been, at least in part, due to this mistake. Dr. Bruce addresses the many risk factors that should have been apparent to VA personnel when treating William in late 2009, as well as violations of VA policies regarding contacting veterans after they miss follow-up appointments. After approximately seven pages of opinions analyzing this evidence, Dr. Bruce sets forth his "strong opinion" that William did not receive adequate treatment at the VA, and that if he had received proper treatment, it could have changed the course and outcome of his life. He contends that the VA's errors "were significant factors that contributed to his suicide on March 18, 2010. In my opinion, Mr. Draughon's failure to recover as well as his eventual suicide were a direct result of the VA not adhering to their own guidelines and standards of care."[24]

Similar to its objections to the other experts' reports, the Government maintains that Dr. Bruce's causation opinion is deficient because it does not address events that transpired on March 17 and 18, 2010. As already discussed, the Court finds that this objection goes to the weight and not the admissibility of the experts' opinions. It is thus overruled and denied. Dr. Bruce's opinion meets the reliability standards that the Court applies in its role as gatekeeper.

---

[24]Doc. 133-6, Bruce Op. at 8.

## II.     Motion for Summary Judgment

### A.     Standards

Summary judgment is appropriate if the moving party demonstrates "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[25] In applying this standard, the Court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party.[26] "There is no genuine [dispute] of material fact unless the evidence, construed in the light most favorable to the non-moving party, is such that a reasonable jury could return a verdict for the non-moving party."[27] A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim."[28] A dispute of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[29]

The moving party initially must show the absence of a genuine dispute of material fact and entitlement to judgment as a matter of law.[30] In attempting to meet this standard, a movant who does not bear the ultimate burden of persuasion at trial need not negate the nonmovant's claim; rather, the movant need simply point out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim.[31]

Once the movant has met the initial burden of showing the absence of a genuine dispute

---

[25]Fed. R. Civ. P. 56(a).

[26]*City of Herriman v. Bell*, 590 F.3d 1176, 1181 (10th Cir. 2010).

[27]*Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 255 (1986)).

[28]*Wright ex rel. Trust Co. of Kan. v. Abbott Labs., Inc.*, 259 F.3d 1226, 1231–32 (10th Cir. 2001) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[29]*Adler*, 144 F.3d at 670 (citing *Anderson,* 477 U.S. at 248).

[30]*Spaulding v. United Transp. Union*, 279 F.3d 901, 904 (10th Cir. 2002), *cert. denied* 537 U.S. 816 (2002) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)).

[31]*Adams v. Am. Guar. & Liab. Ins. Co.*, 233 F.3d 1242, 1246 (10th Cir. 2000) (citing *Adler*, 144 F.3d at 671); *see also Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010).

of material fact, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial."[32]  The nonmoving party may not simply rest upon its pleadings to satisfy its burden.[33]  Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[34]  In setting forward these specific facts, the nonmovant must identify the facts "by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[35]

Finally, summary judgment is not a "disfavored procedural shortcut"; on the contrary, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[36]

### B.  Factual Background

### 1.  Hearsay Objections to the Police Report

Before reciting the uncontroverted facts in this matter, the Court must rule on one other evidentiary issue—Plaintiff's hearsay objection to Defendant's Exhibit O,[37] the police report prepared by Kansas City, Missouri police officers after William Draughon's suicide.  Plaintiff objects that the exhibit is inadmissible hearsay within hearsay.  The Government responds that the witnesses' statements in each report can be presented in an admissible form at trial.[38]

---

[32]*Anderson,* 477 U.S. at 256; *Celotex,* 477 U.S. at 324; *Spaulding,* 279 F.3d at 904 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).

[33]*Anderson,* 477 U.S. at 256; *accord Eck v. Parke, Davis & Co.,* 256 F.3d 1013, 1017 (10th Cir. 2001).

[34]*Mitchell v. City of Moore, Okla.,* 218 F.3d 1190, 1197–98 (10th Cir. 2000) (quoting *Adler,* 144 F.3d at 670–71); *see Kannady,* 590 F.3d at 1169.

[35]*Adler*, 144 at 671.

[36]*Celotex,* 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[37]Doc. 131-16.

[38]*See* Fed. R. Evid. 805.

Summary judgment evidence need not be "submitted 'in a form that would be admissible at trial.'"[39] But "the content or substance of the evidence must be admissible."[40] Under Fed. R. Civ. P. 56(c)(2), a party may object on this basis—that the material "cannot be presented in a form that would be admissible in evidence." Indeed, as the advisory committee notes to the 2010 Federal Rule amendments explain: "The burden is on the proponent to show that the material is admissible as presented or to explain the admissible form that is anticipated."[41] "The requirement is that the party submitting the evidence show that it will be possible to put the information, the substance or content of the evidence, into an admissible form."[42] With respect to hearsay, the proponent of the evidence must make some showing that the substance of the evidence would be admissible at trial by either demonstrating that an exception applies, or that the declarant would testify to the document's contents.[43]

Plaintiff objects to the Government's reliance on two witness statements in the report: Jennifer Moran and Corey Draughon ("Corey"). The statements are undoubtedly hearsay within hearsay. The officers' statements in the report are out-of-court written statements, offered to prove the truth of the matter asserted.[44] And Moran and Corey's statements are hearsay within hearsay—they too are offered for the truth of the matter asserted.

As to the first level of hearsay, the Government does not indicate that the officers who completed the report would testify at trial. Instead, the Government urges that the report falls

---

[39]*Brown v. Perez*, 835 F.3d 1223, 1232 (10th Cir. 2016) (quoting *Trevizo v. Adams*, 455 F.3d 1155, 1160 (10th Cir. 2006)).

[40]*Id.* (quoting *Argo v. Blue Cross & Blue Shield of Kan., Inc.*, 452 F.3d 1193, 1199 (10th Cir. 2006)).

[41]Fed. R. Civ. P. 56 advisory committee's note to 2010 amendment.

[42]*Brown*, 835 F.3d at 1232 (quoting 11 James Wm. Moore et al., Moore's Federal Practice–Civil § 56.91 (3d ed. 2015)); *see O'Connor v. Williams*, 640 F. App'x 747, 750 (10th Cir. 2016).

[43]*See Brown*, 835 F.3d at 1232–33.

[44]*See* Fed. R. Evid. 801(c).

under the public records or business records exceptions to the hearsay rule.  The Court disagrees.

A statement may qualify for the public records exception where:

> (A) it sets out:
> (i)  the office's activities;
> (ii)  a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or
> (iii) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation; and
> (b)  the opponent does not show that the source of information or other circumstances indicate a lack of trustworthiness.[45]

The statements upon which the Government relies in the Police Report are not the officers' observations, nor their factual findings or opinions from a legally authorized investigation.[46]  The statements are those made to them by the witnesses.  The Government has not shown that these statements qualify under the public records exceptions.

Nor has the Government demonstrated that the business records exception applies.  That exception may apply to reports prepared in the normal course of law enforcement investigations.[47]  But similar to the public records exception, this exception does not apply when the declarant is not acting in the regular course of business.  The advisory committee notes use the example of a police report's statement that includes a statement by an informant to demonstrate an instance where "an essential link is broken" because "the supplier of the information does not act in the regular course."[48]  With such statements in a police report, "the

---

[45]Fed. R. Evid. 803(8).

[46]*See United States v. Taylor*, 462 F.3d 1023, 1026 (8th Cir. 2006) ("the [police] report was inadmissible because it did not contain what Rule 803(8)(C) makes admissible—'factual findings resulting from an investigation.'"); *Walker v. City of Okla. City*, No. 98-6457, 2000 WL 135166, at *8 (10th Cir. Feb. 7, 2000) (finding third-party statement in a police report was inadmissible hearsay).

[47]Fed. R. Evid. 803(6); *see Haskell v. U.S. Dep't of Agric.*, 930 F.2d 816, 819 (10th Cir. 1991).

[48]Fed. R. Evid. 803 advisory committee notes.

officer qualifies as acting in the regular course but the informant does not."[49]  Similarly, here the police report's recitation of witness statements does not meet the business records exception to the hearsay rule.

Because the Government has failed to show the substance of this evidence can be presented in an admissible form at trial, the Court must exclude this evidence on summary judgment.[50]

## 2.    Uncontroverted Facts

The following facts are uncontroverted, stipulated, or viewed in the light most favorable to Plaintiff as the nonmoving party.  William Draughon ("William") enlisted with the Marines in February 2001, and was honorably discharged in February 2005.  While in the Marines, William served a seven-month combat tour in Iraq that ended on or around October 2004.  He was a squad leader for at least part of his tour in Iraq.  While there, William was exposed to fire fights and improvised explosive devices ("IED").  He reported that members of his squad died during his tour in Iraq, and he expressed feelings of guilt and responsibility for their deaths.  William kept their dog tags around the mirror of his truck.  His brother Corey recalls William telling him about having to "go into the enemy's huts, homes and whatever they call them over there, and he

---

[49]*Id.*; *see also United States v. Gold*, 739 F. Supp. 1459, 1461 (D. Kan. 1990) (declining to apply business records exception to police report containing witness statement).

[50]The Government did not indicate that it intends to call Officers Heinen or Borkowski to testify about their reports, and the Court will not assume that the Government intends to do so.  If the Government does ultimately call these officers, it would remove one layer of hearsay, and it may be able to present Corey and Moran's statements if it demonstrates that a hearsay exception applies.  Under these circumstances, the Court agrees that Corey's statements may be introduced in an admissible form through his own testimony.  Moran could not testify in person at trial, as she is now deceased.  The Court would not admit her statements under the excited utterance exception about events that transpired the day before his suicide.  Nor would the Court admit Moran's statements that constitute further hearsay about William's past statements about suicide or his PTSD diagnosis.  The only statements by Moran that would be admissible under the excited utterance exception are those that describe the "startling event or condition, made while [she] was under the stress or excitement that it caused."  Fed. R. Evid. 803(2).  The Court is not persuaded that the residual exception applies to Moran's statement.  Under Fed. R. Evid. 807, a statement may qualify under the residual exception where another hearsay exception does not apply and "the statement has equivalent circumstantial guarantees of trustworthiness."  The Court cannot find such guarantees in this statement, particularly given the officer's stated impression that Moran was intoxicated at the time she made her statement.

had to kill them before they would kill him. And some of them would be women, children, and it was either his life or theirs."[51] William received a citation for heroic service during his service in Iraq.

Upon returning to the United States in October 2004, William reported symptoms consistent with PTSD, and was ultimately diagnosed as having PTSD at the time of his discharge from military service. At that time, and on February 10, 2005, William stated to the U.S. Marine Health Care Provider his intention to seek out help through the VA for disability and for his PTSD. In 2008–2009, William had three failed suicide attempts: (1) in 2008, by placing a hangman's noose over a beam in his basement; (2) in January 2009, when he tried to shoot himself in the head and missed; and (3) in August 2009, by overdosing on his medication.

Between February 2005 and August 26, 2009, William attended mental-health appointments at the Veterans Affairs Kansas City Medical Center ("KCVA") on five occasions: August 4, 2005; April 7, 2008; December 16, 2008; January 20, 2009; and March 31, 2009. He was hospitalized at the KCVA from August 28, 2009, until September 2, 2009, and from October 4, 2009, until October 7, 2009. William attended the Substance Abuse Residential Recovery Treatment Program ("SARRTP") at the KCVA from October 7, 2009, until October 28, 2009. Then, from November 18, 2009, until January 6, 2010, William attended the Psychiatry and Addiction Recovery Treatment ("PART") Program at the Leavenworth VA in Kansas.

### *Relevant VA Policies and Procedures for the Treatment of PTSD and Substance Abuse Disorders*

The VA has a procedure in place for identifying patients at high risk for suicide. It contains "carefully defined criteria for high risk suicide" and references the warning signs and high-risk criteria described in the "Suicide Risk Assessment Guide Reference Manual." The

---

[51]Doc. 140-9 at 61:14–62:24.

"Suicide Risk Assessment Guide Reference Manual" includes a list of nonexhaustive factors that

may increase a person's risk for suicide. Some of the factors on this list are:

- Current ideation, intent, plan, access to means

- Previous suicide attempt

- Alcohol/substance abuse

- Current or previous history of psychiatric diagnosis

- Impulsivity and poor self-control

- Recent losses—physical, financial, personal

- Recent discharge from an inpatient psychiatric unit

- Co-morbid health problems

Additionally, the VA issued a memo on April 24, 2008, providing guidance to the

Suicide Prevention Coordinator ("SPC") for identifying and treating patients at high risk for

suicide. The memo requires SPCs to report certain patients as high risk. Among other

requirements:

> Patients, who are admitted for hospitalization as a result of a high-
> risk for suicide ideation, must be placed on the high-risk list, and
> kept on the list for a period of at least 3 months after discharge.
> They must be evaluated at least weekly during the first 30 days
> after discharge. Other patients identified as surviving a suicide
> attempt and those who are placed on the high-risk list for other
> reasons should also be evaluated at least weekly for at least the
> next month.[52]

The policy outlined in the April 24, 2008 memo also requires that such patients have a care plan

including monitoring for suicidality and periods of increased risks. This plan must include

specific processes of follow-up for missed appointments. In addition, there must be a written

safety plan with specific features outlined in the policy, including a list of "situations, stressors,

---

[52]Doc. 139-17 ¶ 4.

thoughts, feelings, behaviors and symptoms that suggest periods of increased risk, as well as step-by-step descriptions of coping strategies and help-seeking behaviors that can be used at these times."[53]

The VA's Clinical Practice Guideline for the Management of Post-Traumatic Stress provides in part:

> Effective PTSD treatment is extremely difficult in the face of active substance use problems unless the substance use[] disorders are also treated. Most often, attempts to address substance problems should proceed concurrently with the direct management of PTSD. However, in cases when the substance use is severe, substance use may require initial treatment and stabilization before progressing to PTSD care (e.g., patient requires detoxification from opiates) . . . .[54]

On July 18, 2008, the VA issued a directive regarding the use of patient record flags ("PRF") to identify patients at high risk for suicide. "The primary purpose of the High Risk for Suicide PRF is to communicate to VA staff that a veteran is at high risk for suicide and the presence of a flag should be considered when making treatment decisions."[55] This flag pops up in the patient's electronic medical record before a health care provider can access the record. The VA directive makes clear that

> a PRF is limited to only those patients at high risk, and only for the duration of the increased risk for suicide. The PRF is removed as soon as it is clinically indicated to do so. This is especially important to minimize the risk of undue stigmatization for the patient, and to maintain the value of the PRF system as an alert to immediate clinical safety concerns.[56]

---

[53]*Id.* ¶ 5(f)(1).

[54]Doc. 139-9 at B-23.

[55]Doc. 139-15 ¶ 2(a).

[56]*Id.* ¶ 2(b).

The directive further explains that whether a veteran is determined to be at high risk for suicide "is always a clinical judgment made after an evaluation of risk factors (e.g., history of past suicide attempts, recent discharge from an inpatient mental health unit), protective factors and the presence or absence of warning signs as listed on the VA Suicide Risk Assessment Pocket Card."[57]

***William's VA Treatment History***

William's PTSD screens were positive at his appointments in 2006 and 2008. In 2007, William reported a history of exposure to IED, grenades and land mines, after which he was dazed and confused. He was referred for consultation for Traumatic Brain Injury ("TBI"), but a 2009 notation in his medical record indicates that he "did not come in for exam at that time."[58]

On March 31, 2009, William told a VA psychiatrist that he struggled with the anniversary of losing some of his buddies in Iraq, and that he always drinks heavily on that date in early April. The psychiatrist indicated in his notes that William suffered from PTSD.

***August 28, 2009–September 2, 2009 Hospitalization***

William was hospitalized at the KCVA for his first acute stabilization from August 28, 2009, until September 2, 2009. On August 27, 2009, William drank alcohol despite being on Antabuse, dressed himself in camouflage, blackened his face, and got a knife. After police were called, William ran from them and eventually woke up inside his dog house. He reported that he had been drinking earlier that evening after finding some medals and newspaper articles about the war.

The next morning, on August 28, William's girlfriend's mother took him to the KCVA. He admitted to suicidal ideation "off and on recently with thoughts of shooting himself or going

---

[57]*Id.* ¶ 2(d)(2).

[58]Doc. 131-2 at USA_000534.

off a bridge."[59]  He admitted to thinking of harming himself, and that he had a plan.  He reported that "he was driving his truck last night 'very fast and looking at something to crash into.'"[60]  William reported that he had "horrible PTSD symptoms," including intense flashbacks of his friends dying, and "things that he had to do during the war."  He reported drinking heavily to self-medicate.  Dr. Demark, William's principal treating VA Psychiatrist, opines that William was using alcohol to try to cover up or treat his PTSD symptoms.

William told a nurse about a prior suicide attempt, "to shoot myself, had the gun to my chin and the gun went off but missed me."[61]  He told VA providers that he had also recently attempted suicide, when he carried around a loaded gun, told everyone to leave him alone, drank alcohol, and overdosed on his medication.  His girlfriend found him unresponsive, and he was taken to another hospital and treated.  William's suicide risk assessment screen was positive, and VA providers set a high-risk flag for suicidal behavior in his electronic record on August 28, 2009.  There are references in the medical record between August 29 and October 4, 2009 to William's suicide safety plan, however the details of the plan are not included in that record.

On August 31, 2009, the VA staff provided William with information about the SARRTP for after discharge.  SARRTP is a residential rehabilitation program for treating substance abuse disorders.  The SAARTP also provides care for any co-morbidly occurring psychological conditions, including PTSD.  William stated he was not interested in the program because he was already enrolled in an outpatient substance abuse treatment program.

On September 1, 2009, VA staff provided William with information about the VA's Stress Disorders Treatment Program ("SDTP") in Topeka.  This program is offered to "veterans

---

[59]*Id.* at USA_00627.

[60]*Id.* at USA_00598.

[61]Doc. 139-2 at USA_00613.

and active-duty soldiers who have experienced military-related trauma (e.g. combat trauma, military sexual trauma, other traumatic assaults) that has led to [PTSD], depression, substance abuse, and other life difficulties."[62]  It is a seven-week "intensive inpatient program designed to help veterans decrease symptoms, improve their quality of life, enhance self-esteem, return to work or school, and reintegrate with their families and communities."[63]  Admission to the program requires thirty days of sobriety.  On September 2, 2009, a VA provider strongly encouraged William to pursue admission to the SDTP and provided him with informational materials, including the application.  Although William expressed a desire "to enter the program ASAP," he had not attained thirty days of sobriety by September 2.  William was discharged on September 2 to outpatient treatment.

### *Post-September 2, 2009 Outpatient Treatment*

Between his discharge on September 2, and October 4, 2009, VA providers had at least four in-person contacts with William.  During this timeframe, VA providers also attempted to call William on at least five occasions regarding his condition, but had to leave voicemails.  William later admitted that he received these voicemails, but chose not to return them.

On September 16, 2009, William met with Dr. Demark, and his PTSD GAF score was recorded as 50.  The GAF score is used to determine the severity of a veteran's impairment of functioning caused by PTSD.  It helps the VA determine the veteran's percentage of compensation.  A score between 41 and 50 indicates "[s]evere symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job)."[64]

---

[62]Doc. 139-5 at 3.

[63]*Id.*

[64]Doc. 139-6.

On September 30, 2009, William met with Dr. Demark again, and reported an incident one evening that week when he went out drinking at a bar, drove home, and was verbally abusive to his girlfriend. William had stopped taking his medication, and did not remember the events from that evening.

On October 2, 2009, William met with a VA Suicide Prevention case manager, and expressed his continued interest in the SDTP program, but indicated he was not ready to fill out the application.

### October 4, 2009–October 7, 2009 Hospitalization

William was hospitalized at the KCVA for his second acute stabilization from October 4, 2009 until October 7, 2009. On October 4, 2009, at 2:09 a.m., the Kansas City Police Department brought William to the KCVA emergency room, because "[a]pparently he ha[d] medication today and began having flashbacks," and was positive for alcohol. The prior evening, William had been drinking around a campfire with a buddy and talking about the war. He admitted to VA providers that he had suicidal ideations and was admitted for "mood and medication management and [alcohol] detox."[65] While at the hospital, William rammed his head into a Plexiglas window, and had to be restrained by officers. He told VA Providers on October 5, 2009, that he wanted to attend SARRTP because his girlfriend, Jennifer Moran, would not let him return home without seeking help. Two progress notes during this hospitalization list William's primary diagnosis as "Bipolar Affective Disorder."[66]

### SARRTP: October 7, 2009–October 28, 2009

William attended SARRTP at the KCVA from October 7 through October 28, 2009. While at SARRTP, William learned coping skills for PTSD, including grounding and deep

---

[65]Doc. 131-2 at USA_00521.

[66]Doc. 139-2 at USA_00459, USA_479.

breathing techniques, and reported that he was practicing these skills "with some benefit."[67] William was elected to serve as president of the residents in SARRTP, which is a position elected by those residents. The president takes a leadership role in the program, reads the rules, and helps get meetings started.

At the beginning of his time in SARRTP, VA providers discussed the possibility of William attending the PART program at the Leavenworth VA, a seven-week, dual-diagnosis program that treats veterans with both a substance-abuse disorder and a mental health condition. William was uninterested at first. But on October 15, 2009, VA staff provided him with a PART application, and on October 22, he told his VA providers that "he would like to go to the PART program" because he realized that he needed "more aftercare than just outpatient."[68] He and Moran had agreed that it was the best option for him. William completed the SARRTP program and reported that he learned a lot: "the breathing techniques he is currently using is helpful. He still reports some anxiety, but it is not as significant as it was before."[69] He looked forward to attending the PART program.

On October 9, 2009, while receiving in-patient treatment in SARRTP, William told VA staff psychologist Dr. Amalia Bullard he was experiencing "horrible PTSD symptoms" including flashbacks, anger and nightmares, and he drinks heavily to "self-medicate" his PTSD. During the same session, William told Dr. Bullard he desired help for his PTSD and wanted to apply for the SDTP program in Topeka, but was having difficulty completing the application, which required him to detail his traumatic combat memories. William asked Dr. Bullard to assist him in filling out the application, making a follow-up appointment with her on October 20, 2009 for

---

[67]*Id.* at USA_00393.

[68]*Id.* at USA_00384.

[69]*Id.* at USA_00098.

that purpose. There is no record that Dr. Bullard helped William complete the SDTP application on October 20.

On October 15, 2009, William discussed his PTSD symptoms with two other VA health care providers—Dr. Dent and Dr. Demark. He told them both that his combat experience, particularly witnessing his friends' death in Iraq, triggers PTSD symptoms.

### Post October 28, 2009 Outpatient Treatment

William returned home from October 28, 2009, until PART began on November 18, 2009. During that time, he reported remaining sober and doing well. Had William applied to the SDTP program at this time, he would have been eligible. On November 10, he reported to VA providers that he had been working in construction since his SARRTP discharge. He was reminded by VA providers of the crisis hotline number, mental health walk-in clinic, and 24/7 emergency room, which he could use as needed.

### PART: November 18, 2009–January 6, 2010

William attended PART at the Leavenworth VA from November 18, 2009 until January 6, 2010. His medical record indicates that he "is admitted to PART program and will be assisted with sobriety maintenance."[70] It is fairly common for a patient to attend PART, which provides skills for emotional regulation that can come up during intense trauma treatment, before going through SDTP. Dr. Huet, a PART psychiatrist, first saw William on November 19, and on that date William reported daily passive suicidal ideation—thinking that one is better off dead or has no reason to live.[71] According to Dr. Huet, William had no further suicidal ideation, passive or active, after that date. Also on November 19, William reported that he was in a stable relationship with Moran, that she was very supportive of him, and that he loved her. They had

---

[70]Doc. 139-2 at USA_00335.

[71]By contrast, active suicidal ideation is where one thinks about taking one's own life.

been in a relationship since October 2008, and had lived together for almost one year before William entered the PART program. He spoke of or visited with Moran several times while in the program. Dr. Huet diagnosed William with PTSD, and wanted to rule out Bipolar I disorder. William remained on the suicide high-risk list with a current GAF score of 50.

On November 23 and 24, 2009, William expressed a desire to go to SDTP following PART, but he had not yet completed his application. Dr. Rosinski, William's PART psychologist, assisted William in completing his application to SDTP several times during his stay at PART. By December 21, 2009, William reported that he believed he was ready for the SDTP program now, and hoped to "figure out how to live with PTSD better."[72] On December 22, he told Dr. Huet that he was still waiting to hear back regarding his admission to SDTP, but hoped to hear soon. On December 23, he discussed financial assistance options with a VA social worker if he attended SDTP, including references to community resources and organizations that could assist with his monthly bills during the duration of this treatment at SDTP.

On December 2, 2009, Suicide Prevention Coordinator Cherie Durkin reduced William's suicide risk level, and the Category II high-risk flag was removed from his electronic medical record. Durkin and Dr. Demark testified differently about who was responsible for deciding whether to remove the high-risk flag. Durkin characterized her role as "clerical," stating that she merely sent the criteria for maintaining the high-risk flag to Dr. Demark to determine whether it should remain in place because it had been approximately 90 days since the flag had been set on August 28, 2009. Durkin does not recall whether she spoke with Dr. Demark about the decision to remove the high-risk flag from William's chart, but stated that as William's health care provider, Dr. Demark made the decision to remove that flag. Dr. Demark testified that he

---

[72]Doc. 131-2 at USA_00194–95.

believed Durkin made the ultimate decision whether to remove the high-risk flag, and denied making that determination, despite signing the note reflecting the flag had been removed. Neither Dr. Huet nor Dr. Rosinksi participated in the decision to remove the suicide high risk flag, but Dr. Huet testified that he saw no problem with removing the flag because William had been engaged and compliant with treatment and no longer had suicidal ideation.

On December 28, 2009, William reported that his medication was working well, and that he was not having nightmares. Techniques he learned in treatment were helping identify his triggers. He rated his depression and anxiety as 3 and 3.5 respectively on a scale of 1-10, 10 being highest.

On December 29, 2009, Dr. Huet administered a PCL screening test for PTSD. William's score was 42, or "negative." William reported to Dr. Huet that same day that he was doing "great" with "no problems."[73] He told Dr. Rosinski on that day that he was in a good mood, and his current medications were "the best combo yet."

Also on December 29, William told VA providers that he had chosen not to go to SDTP program at the Topeka VA after discharge, but rather, work for awhile to earn money. William feared foreclosure on his home that he shared with Moran and his brother, Corey. He had only received a 10% disability rating for his PTSD, resulting in a meager $120 per month in disability benefits. William also discussed this decision with Dr. Rosinski on December 29, and discussed his plan to continue his treatment in other ways, such as exposure therapy.

On January 4, 2010, William met with Dr. Huet and reported that he was doing well and had no cravings for drugs or alcohol. He denied being suicidal or planning self-harm.

---

[73]*Id.* at USA_00171–72.

On January 6, 2010, the day of William's discharge from the PART program, an addendum was added to his record that the previous PCL screen was for the wrong patient and the accurate report for William was 65, or "positive," and reflected different answers to the questions as those reflected in the original December 29 screening. Dr. Huet learned of the PCL error on January 6. He testified that it would have been appropriate to follow-up with William and disclose the mistake, however, Dr. Huet has no memory of doing so. Dr. Huet indicated during his deposition testimony that given William's PTSD score, follow-up "would be very important."[74] However, William may not have understood the importance of receiving follow-up care when he was discharged from PART. Follow-up was necessary to determine William's risk, and it was his clinician's responsibility to follow-up with him.

Upon completing PART on January 6, 2010, William reported learning "significant information that would be helpful to him after leaving the PART program," on the issues of alcohol and cocaine dependence. He was provided with information regarding the emergency room and walk-in services, which he agreed to utilize as needed. He scheduled a follow-up appointment with his VA psychiatrist, Dr. Demark, the next day, January 7. His medical records indicate that he wanted to "arrange his own appointments with Dr. Dent and with the ATP providers at the Kansas City VAMC."[75] Dr. Dent received this note. The record states that William's January 7 appointment with Dr. Demark was "cancelled by patient."[76] There is no indication that Dr. Demark took steps to contact William about this missed appointment.[77]

*Post-Discharge*

---

[74] Doc. 139-8 at 67:23.

[75] Doc. 131-2 at USA_00149.

[76] Doc. 129 at 4, Stip. No. 20.

[77] The Court agrees with the Government that Plaintiff's Exhibits R and S, the 2013 and 2014 VA policies on No Show Appointments, are immaterial. Neither policy was operative in 2010 when William was discharged.

On January 12, 2010, Dr. Rosinski called William to "follow up with him regarding how he has done with the transition home from the PART program."[78] She left him a voicemail and asked him to call her back.

Dr. Dent contacted William within two or three weeks after his discharge from PART to arrange a follow-up appointment because Plaintiff had not yet contacted him. During that call, Dr. Dent asked how William was doing, and William denied any suicidal ideation. Dr. Dent scheduled follow-up appointments with William for himself and for Dr. Demark in April 2010. Although Dr. Dent would have preferred an earlier follow-up appointment, the April appointments were set based on William's willingness and availability, and based on the fact that he was not suicidal or homicidal at the time. Regardless of the April appointments, patients at the VA always have the opportunity to "walk-in for a session at any time."[79] Dr. Dent did not enter a note regarding this conversation with William because he did not deem the conversation "particularly significant."[80]

On March 5, 2010, William attended an appointment with his VA primary care physician, Dr. Walterbach. At this appointment, William reported no alcohol or drug use in the past five months, that he was doing better, and had some job opportunities. A drug and alcohol screen confirmed no alcohol or drugs in William's system.

Andrea Barber, William's former girlfriend and the mother of one of his children, saw William in early March 2010, and he seemed to her happy and excited to have his daughter for the weekend. Barber believed William had been doing better in the three or four months before he died, stating that he looked "happy" and "healthy," and that he appeared to be sober.

---

[78]Doc. 131-2 at USA_00146.

[79]Doc. 131-6 at 48:08–21.

[80]*Id.* at 83:19–84:8.

William was accepted into Colorado Technical University on March 15, 2010.

On March 16, 2010, William had lunch with his brother Corey at Tanner's Bar and Grill. William's stepmother Laurie Draughon also saw William on March 16 when he and Moran came over to her house while test driving a car. They stayed for a few hours and left. William's father saw William on March 16, and testified that he was "good to go."

Between November 2009, and March 18, 2010, Corey witnessed his brother William have flashback episodes on three occasions, although he could not recall the exact dates. He testified about these episodes as follows:

> He wasn't right in the head. He was running around saying that the enemy's coming, the enemy's coming. You know, everybody get down in the basement, I will take care of this, you know. We got them out here in front of the house, they are starting to come up the back side, you know, I am going to flank them around. I mean, what kind of talk is that, man? That's not normal.[81]

Corey testified that these episodes happened after William returned from treatment until the date of his death.

### William's Suicide

On St. Patrick's Day, March 17, 2010, William went out with his brother. His father explained, "It was a big deal for William, and he's Irish, and St. Patty's Day was one of his holidays. And him and his brother went out and drank the night before. And on the night of, he still had a hangover from the night before, didn't want to go out, but Jennifer wanted to go out, so he appeased her, and they went out."[82] William died on March 18, 2010, around 1:30 a.m. from a self-inflicted gunshot wound to the head. Corey recalls hearing William and Moran arguing, and within twenty minutes, Corey went upstairs right as William shot himself.

---

[81]Doc. 140-9 at 47:9–25.

[82]Doc. 131-15 at 238:04–16.

William's postmortem toxicology report showed the following result:

Methanol-< 5mg/dL
Acetone-<5mg/dL
Ethanol-293 mg/dL
Isopropanol-<5mg/dL
Volatile Panel-Blood
Methanol-< 5mg/dL
Acetone-<5mg/dL
Ethanol-335 mg/dL
Isopropanol-<5mg/dL

Defendant's expert, Dr. Christopher Ticknor characterized these results as demonstrating that Plaintiff was "grossly intoxicated" at the time of his suicide.

After reasonable inquiry, no calls to a suicide or crisis hotline regarding or by William after October 7, 2009, can be identified.  After reasonable inquiry, no visits to a VA emergency room regarding or by William after October 7, 2009, can be identified.  After reasonable inquiry, no suicide note for William has been found.

On April 7, 2010, Laurie Draughon contacted Dr. Rosinski and indicated "the family's shock at what happened as they had felt [William] was doing better psychiatrically."[83]

***Expert Opinions***

The Government's expert, Dr. Ticknor, testified at his deposition that William's suicide was caused entirely by a drunken quarrel with his girlfriend, and that his PTSD did not cause or contribute to his alcoholism, or his suicide.

Plaintiff submits three expert opinions on standard of care and causation: Drs. Bruce, Allen, and Amsel.  All three experts opine that William did not receive adequate and timely treatment at the VA for his PTSD in keeping with the standard of care, resulting in his suicide.  Among the problems Dr. Bruce identified are: the VA's failure to treat his PTSD concurrently

---

[83]Doc. 131-2 at USA_00137.

with his substance abuse; ineffective use of "supportive therapy"; inappropriate dosages of psychiatric medicine in light of William's medical history; removing William from the high-risk list of suicidal veterans; mischarting his PCL screen and failing to follow up with William on the error; and failure to contact him after his missed January 7 appointment.

Dr. Allen agrees that William's high risk flag for suicide was erroneously removed from his medical chart in December 2009, and contends that this error resulted in less regular suicide risk assessment and safety planning. He also agrees that the VA erred by failing to follow up with William about his missed appointment in January. Further, Dr. Allen opines that the VA breached the standard of care by failing to ensure specialized and continuing care for William's PTSD, by discharging him despite his high PCL score, by failing to assess and manage his suicide risk, and by failing to follow up. Dr. Allen contends that the VA's failures caused or contributed to William's death.

Dr. Amsel agrees that William's PTSD and substance abuse were not treated simultaneously, as they should have been. He further faults the VA staff for failing to help William more quickly complete the application for the SDTP program in Topeka, and that he should have simply been admitted to that program sooner. Dr. Amsel believes that TBI should have been evaluated during William's treatment but never was. He also faults the VA for removing William's high suicide risk flag and for failing to follow up with him after his missed appointment on January 7. Dr. Amsel contends that these breaches of the standard of care directly caused or contributed to William's suicide.

### C. Discussion

Plaintiff brings this wrongful death action under the Federal Tort Claims Act ("FTCA"). When a plaintiff brings suit against the United States under the FTCA, the source of law is "the

law of the place where the act or omission occurred."[84]  The Court has already determined that Plaintiff's claim arises under Missouri law.[85]  To state a wrongful death claim on a theory of negligence under Missouri law, Plaintiff must establish the following elements at trial: "(1) the defendant owed a duty of care to the decedent; (2) the defendant breached that duty; (3) the breach was the cause in fact and the proximate cause of his death; and (4) as a result of the breach, the plaintiff suffered damages."[86]  The standard of care generally must be established by expert testimony.[87]  The Government moves for summary judgment on two elements—breach and causation.

### 1.      Breach of the Duty of Care

As an initial matter, the Government challenges the scope of Plaintiff's allegations that it breached the applicable standard of care.  The Government argues that several of the breaches discussed in the Pretrial Order are not discussed by the experts, and characterizes the remaining alleged breaches as either clinical disagreements, or contentions that the VA should have forced William to seek additional care.  Plaintiff responds that the VA breached the standard of care at multiple points during his treatment in 2009 and 2010.  Specifically, Plaintiff alleges that the VA fell below the applicable standard of care by (1) charting the wrong veteran's PCL score before discharging William from the PART program, and failing to correct it until the date of discharge; (2) failing to provide the requisite follow-up care to William after his PART discharge; (3) removing William from its list of patients at high-risk for suicide; (4) failing to follow its own

---

[84]28 U.S.C. § 1346(b)(1); *Flynn v. United States*, 902 F.2d 1524, 1527 (10th Cir. 1990).

[85]*See* Doc. 33.

[86]*Heffernan v. Reinhold*, 73 S.W.3d 659, 665 (Mo. Ct. App. 2002).

[87]*See, e.g.*, *McLaughlin v. Griffith*, 220 S.W.3d 319, 320–21 (Mo. Ct. App. 2007).

policies with respect to William's care; and (5) failing to provide concurrent and specialty treatment for William's PTSD and substance abuse.

The Government argues that Plaintiff did not adequately plead as a separate breach the mistaken PCL score. The Court has reviewed the Amended Complaint,[88] the excerpt filed by the Government of Plaintiff's interrogatory responses,[89] and the Pretrial Order,[90] and finds that this allegation was sufficiently alleged. The Pretrial Order "controls the course of the action unless the court modifies it."[91] "Claims, issues, defenses, or theories of damages not included in the pretrial order are waived."[92] The Pretrial Order should be "'liberally construed to cover any of the legal or factual theories that might be embraced by their language.' But the primary purpose of pretrial orders is to avoid surprise by requiring parties to 'fully and fairly disclose their views as to what the real issues of the trial will be.'"[93]

Plaintiff has consistently alleged that the VA breached the standard of care by failing to follow and maintain their own policies for treating individuals with William's health conditions; namely, PTSD and substance abuse disorder. He also has consistently alleged that the VA did not properly treat William's PTSD in conjunction with his substance abuse. Plaintiff's allegation about the mischarted PTSD screening score is a specific example of these general allegations of breach. The Pretrial Order not only alleges the contention about the mischarted PCL score, but it

---

[88]Doc. 53. Of course, Plaintiff was not required to plead his legal theories in this pleading. *Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 347 (2013); *Zokari v. Gates*, 561 F.3d 1076, 1084 (10th Cir. 2009).

[89]Doc. 131-24.

[90]Doc. 129.

[91]Fed. R. Civ. P. 16(d).

[92]*Zenith Petroleum Corp. v. Steerman*, 656 F. App'x 885, 887 (10th Cir. 2016) (quoting *Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1276–77 (10th Cir. 2006)).

[93]*Id.* (quoting *Trujillo v. Uniroyal Corp.*, 608 F.2d 815, 818 (10th Cir. 1979), and *Cortez*, 460 F.3d at 1276).

is underlined in Plaintiff's statement of his factual contentions.[94]  The Court finds that the allegation that the VA charted the wrong PTSD screening score was sufficiently pled in the Pretrial Order, and pursuing this theory on summary judgment should not come as a surprise to the Government.

Nonetheless, to the extent Plaintiff asks the Court to ignore the Government's arguments in the reply brief challenging the PTSD screening score as an independent breach, the Court denies this request.  Plaintiff raised this as an independent breach for the first time in the response to the motion for summary judgment, and suggested that the Government should be prohibited from addressing it as such in the reply.  While this theory was fairly alleged in the Pretrial Order as an example of his more generalized breach allegations, the Pretrial Order did not make clear that Plaintiff would pursue this theory as an independent breach.  The Court will consider the Government's arguments in the reply, and grants Plaintiff's motion to file its proposed three-page surreply to address this issue.

> ### a.      Charting Incorrect PTSD Screening Score and Removing High Suicide Risk Flag

Plaintiff alleges that the VA breached its duty of care to William when it mischarted his PCL score in December 2009, and when it removed him from the list of patients at high risk of suicide earlier that month.  Similar to the PCL score allegation discussed above, Plaintiff's allegation that William was inappropriately removed from the list of patients at high risk of suicide is part of his more generalized allegations about follow-up care, concurrent treatment, and failure to follow VA policies.[95]  Therefore, the Court addresses these allegations in its discussion of each of the three alleged generalized breaches.[96]

---

[94]Doc. 129 at 9.

[95]The Court notes that even these three generalized allegations of breach are intricately intertwined.  For example, Plaintiff's arguments about the VA's failure to follow its own policies include the policies on follow-up

### b. Failure to Follow and Reasonably Interpret VA Policies

Plaintiff maintains that the VA breached its duty of care by failing to follow various VA policies governing William's treatment, or by unreasonably interpreting its policies when treating William. Plaintiff points to the VA's decision to remove William's high-risk suicide flag on December 2, 2009, thereby triggering less required follow-up care upon his discharge in January 2010. His experts maintain that VA policies governing managing and treating patients with PTSD, maintaining and removing patients on the high-risk suicide list, and contacting veterans who miss mental health appointments were not followed.

The Government argues that the VA's decision to remove William from its high-risk list is not a viable breach because it involved an exercise of clinical judgment. Under Missouri law, where "there is room for an honest difference of opinion among competent physicians, a physician who uses his own best judgment cannot be convicted of negligence, even though it may afterward develop that he was mistaken."[97] The problem with the Government's argument is that viewing the evidence in the light most favorable to Plaintiff, there was no exercise of judgment in removing William's high risk flag. In fact, VA staff members disagree about who made the ultimate decision to remove William from the list. This is not a case like *Haase* where there is a mere difference of medical opinion about the correct course of action; there is no indication that Dr. Demark or Ms. Durkin considered and exercised a reasoned decision about whether or not William should come off of the list. Ms. Durkin considered her role to be

care. Therefore, while the Court discusses each of these general theories of breach separately, the Court is cognizant that none of Plaintiff's allegations of breach can be neatly isolated at a particular moment in time, but instead are interrelated.

[96]Similarly, Plaintiff states in a footnote that it sufficiently alleged claims that the VA breached its duty of care by failing to treat William for suspected TBI and Bipolar disorder. While it may be true that William was not treated for these suspected illnesses, despite indications in the medical record that the providers suspected they were at play, because there is no evidence linking the failure to treat these issues to his suicide, the Court need not consider these allegations of breach.

[97]*Haase v. Garfinkel*, 418 S.W.2d 108, 114 (Mo. 1967).

clerical, and Dr. Demark does not recall taking part in the decision, and believed that it was Ms. Durkin's decision. Moreover, Plaintiff has come forward with evidence that the failure to document the reasons for removing the flag fell below the applicable standard of care. This evidence is sufficient to create a genuine issue of material fact for trial.

The Government points to Dr. Huet's deposition testimony that he had no problem with the decision to remove William from the high-risk list. But it is uncontroverted that Dr. Huet did not take part in the decision to remove the flag. The Government also contends that Dr. Demark now contends that it was not a problem to remove the flag. To the extent the Government relies on the fact that Dr. Demark signed the note authorizing removal of the flag, that does not create a genuine issue of material fact. Viewing the evidence in the light most favorable to Plaintiff, Dr. Demark was not the decisionmaker and has no recollection of authorizing William's removal from the list. Also, viewing the evidence in the light most favorable to Plaintiff, the removal was not based on a clinical judgment, but on a clerical removal as soon as the 90-day mark had passed. Plaintiff's experts contend that the VA removed him from the list without any explanation, and that the record did not support the decision. For example, Dr. Allen explained:

> Ms. Durkin erroneously reduced Mr. Draughon's risk assessment from high to low or moderate on 4 Dec 2009. This may have been based on the fact Mr. Draughon was in better condition on that date although the rationale is not documented. It does appear that Mr. Draughon's condition had improved. However, it is likely that Mr. Draughon's apparent improvement was related to a long period of intensive treatment and round-the-clock supervision. The removal of the Category l1 Flag in that circumstance can only apply to that circumstance, ie, he could be considered low to moderate risk while drug and alcohol free, receiving medications and supportive care in a supervised setting. His risk under other circumstances was not assessed and, in fact, continued care in a residential setting, the Stress Disorders Treatment Program, was recommended but did not occur. There appears to have been no

consideration given to the likely return of his problems and
attendant worsening of his suicide risk.[98]

Dr. Allen proceeded to explain that the VA should have assessed William's risk factors at the

time of discharge, because "risk is highest following discharge and prior to establishing care in

another setting."[99]  A reasonable trier of fact could conclude from this evidence that the decision

to remove Plaintiff from the high-risk list, despite his improvement while in residential

treatment, breached the standard of care.

### c.  Inadequate Follow-up Care

Plaintiff maintains that the VA breached the standard of care by failing to provide the

appropriate follow-up care for William after he was discharged from the PART program on

January 6, 2010.  This theory of breach also relies on Plaintiff's contention that William should

not have been removed from the list of high-risk for suicide patients; Plaintiff contends that as a

high-risk patient, he should have received weekly evaluations for the first thirty days after

discharge, a care plan that included a process for follow-up from the VA for missed

appointments, a written safety plan, and high-risk monitoring for at least three months after

discharge.  Plaintiff points to the positive PCL score as further evidence that William should

have remained on the high risk list, and should have been monitored more closely at discharge.

The Government mistakenly characterizes Plaintiff's argument as contending that the VA

should have forced William to attend his follow-up appointments, or that he should have been

involuntarily committed.  But that is not Plaintiff's contention.  This theory of breach derives

from the premise that William was not monitored as he should have been had his high-risk flag

not been removed.  There is no dispute that a patient discharged while still in high-risk status

---

[98]Doc. 140-5 at 4.

[99]*Id.*

would be subject to aggressive follow-up and monitoring under the VA's policies, as described by Plaintiff. Because there is a genuine issue of material fact, as set forth above, about whether William's high-risk designation was properly removed, the appropriate level of follow-up care is also a genuine issue of material fact.

If the trier of fact determines that the high risk flag was improperly removed, it is undisputed that VA policies required it to monitor William on a weekly basis. Viewing the evidence in the light most favorable to Plaintiff, the VA breached its standard of care for follow-up when it allowed William to reschedule his next appointment in April, months after his discharge, and by failing to monitor William and follow-up on his missed appointment in January.

Moreover, there is a genuine issue of material fact about whether the VA breached its duty of care in failing to better follow-up with William even without the high-risk designation. Viewing the evidence in the light most favorable to Plaintiff, after William cancelled his first follow-up appointment the day after his discharge with Dr. Demark, there was no attempt to contact him for two to three weeks when Dr. Dent called him to discuss a follow-up appointment. During this conversation, which Dr. Dent characterized as "not particularly significant," William asked to schedule out his next follow-up appointments in April. Dr. Demark made no attempt to reschedule the appointment after William cancelled. Plaintiff's experts maintain that these providers should have made a greater effort to establish follow-up appointments immediately after William's discharge given that it was a critical period of transition for him, and given his operative PCL score, which Dr. Huet testified meant that follow-up care was important.

The Government argues that William was offered and agreed to receive extensive inpatient and outpatient care from the VA. It points out that the SDTP program had been made available to him following PART, and that it had no duty to force William to attend his January 7, 2010 follow-up appointment or SDTP. But Plaintiff argues that it was the failure to assist Plaintiff in attending SDTP—a program that would more specifically deal with his PTSD— instead of PART, that constitutes a breach of the standard of care. A reasonable trier of fact could conclude that by the time William completed the seven-week PART program, he was unable to immediately begin another seven-week program. He feared foreclosure on his home and opted instead to be discharged and work for a period of time in order to pay down his mortgage. Viewing the evidence in the light most favorable to Plaintiff, had William received assistance in applying for the SDTP program sooner, he could have attended that specialized program before PART, or instead of PART, while he continued to be flagged as a patient at high-risk for suicide. Plaintiff's experts contend that this program would have better provided concurrent and specialty treatment for William's PTSD. Given this evidence, a reasonable trier of fact could conclude that the VA's follow-up treatment fell below the standard of care.

### d. Failure to Provide Concurrent and Specialty Treatment for William's PTSD and Substance Abuse

Finally, Plaintiff argues that the VA breached its duty of care to William by improperly treating his PTSD in conjunction with his substance abuse.[100] Plaintiff maintains that William was not provided with the necessary specialty care for his PTSD in the fall and winter of 2009–2010, which was the root cause of his alcohol abuse. As part of this breach, Plaintiff contends that the VA failed to timely refer him to the SDTP program, and that he should have been

---

[100]In its opening brief, the Government suggests that Plaintiff failed to demonstrate a breach associated with the VA's treatment of William's alcohol abuse. But that is not Plaintiff's argument. Plaintiff argues that the VA failed to provide concurrent and specialty treatment for William's PTSD when it treated his alcohol dependency.

referred to SDTP instead of PART after he completed the SARRTP program. In contrast, the Government's expert Dr. Ticknor contends that William's alcohol abuse and impulsivity were separate problems, unrelated to his PTSD, and that the VA properly treated these conditions.

The Court agrees that there is a genuine issue of material fact about the degree to which William's substance abuse was a symptom of his PTSD, or a separate ailment, and to what extent his treatment should have focused more on one versus the other. The experts vehemently disagree about these issues, and a reasonable trier of fact could find in favor of Plaintiff.

There is also a genuine issue of material fact about whether the VA's treatment of William's PTSD fell below the applicable standard of care. The Government points to evidence that PART and SAARTP were designed to treat both William's substance abuse and his PTSD, and that it is not uncommon to attend PART before entering SDTP. Therefore, the Government argues that it fulfilled its duty to treat his comorbid conditions. But Plaintiff's experts contend that William's treatment did not specifically address his PTSD symptoms. For example, Dr. Bruce explains that SDTP would have provided William with certain "proven treatments for PTSD, including prolonged exposure (PE) and Cognitive Processing Therapy (CPT)," which had not been provided by the VA up to that point.[101] He contends that although William was "treated aggressively" for his alcohol and substance use, he did not receive concurrent treatment for his PTSD.[102] Likewise, Dr. Amsel and Dr. Bruce criticize the VA's failure to help William complete the SDTP application sooner. In addition, a reasonable trier of fact could conclude from examining the VA's materials describing each program that SDTP would have placed a heavier emphasis on William's PTSD as compared to PART, which had been recommended to help him with sobriety "maintenance." Given the record evidence suggesting that William's

---

[101] Doc. 140-3 at 7.

[102] Doc. 140-4 at 4.

substance abuse was part of an effort to self-medicate, and was tied to his PTSD symptoms, a reasonable trier of fact could conclude that the VA breached the standard of care by not timely providing the assistance William needed to apply to SDPT program, which would have specifically targeted his PTSD and provided concurrent specialized treatment for PTSD and substance abuse.

### 2. Causation

The Government argues that there is no evidence of causation sufficient to support Plaintiff's claim for two reasons: (1) his experts' opinions are inadmissible; and (2) the circumstances of William's suicide are too attenuated from the alleged breaches of the duty of care by time, intervening events, and a lack of notice and foreseeability. The Court has already addressed the *Daubert* issue and determined that Plaintiff's experts' opinions are admissible. Therefore, the Court proceeds to the question of proximate cause—whether William's suicide was too attenuated from his treatment to establish causation.

As previously recited in its discussion of the *Daubert* motion, Plaintiff must be able to offer evidence of proximate causation—that "suicide was 'the natural and probable consequence' of the injury he suffered at the hands of the defendant."[103] The Missouri Supreme Court has cited with approval modern psychiatric scholarship supporting "the idea that suicide is sometimes a foreseeable result of traumatic injuries."[104] If Plaintiff produces evidence "that the

---

[103]*Kivland v. Columbia Orthopaedic Grp., LLP*, 331 S.W.3d 299, 309 (Mo. 2011) (en banc) (quoting *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 865 (Mo. 1993) (en banc)).

[104]*Id.* at 308–09 (citing Allen C. Schlinsog, Jr., *The Suicidal Decedent: Culpable Wrongdoer, or Wrongfully Deceased*, 24 J. Marshall L. Rev. 463, 479, n.76 (1991) and Gabriel Ryb E., M.D. et al., *Longitudinal Study of Suicide After Traumatic Injury*, 61 J. Trauma 799 (2006) (finding that suicide is more common for trauma patients than for the general population, particularly with increased age, for white male trauma patients, for trauma patients having a positive alcohol toxicology and for trauma patients suffering from disability resulting from the trauma)).

suicide resulted from the injury, the claim then can be submitted to the jury to decide as a question of fact, whether the suicide is a direct result of the defendant's negligence."[105]

The Government argues that there is no direct evidence that William was experiencing PTSD symptoms on March 18, 2010. It points to evidence that William had been doing well after his January discharge. Andrea Barber, William's former girlfriend, observed that he was looking healthy, happy, and sober in the months leading up to his death. William's father and stepmother saw him two days before the suicide and thought he was doing well. William had just learned he had been accepted into school. The Government also points to evidence that neither Dr. Dent nor Dr. Walterbach noted any indications of suicide ideation or substance abuse after William's January discharge.[106] The burden therefore shifts to Plaintiff to produce evidence that William's suicide resulted from the VA's breaches of the duty of care during his treatment. As set forth below, Plaintiff has met this burden.

First, Plaintiff's experts all opine that William's suicide was a result of the VA's failures to properly treat William's PTSD, and to follow-up with him after he was discharged in January 2010. They opine that had William enjoyed the full panoply of care associated with the high-risk flag following his discharge in January 2010, including weekly monitoring, the VA would have likely intervened and provided William with the necessary resources to prevent his suicide in March. Moreover, had William been enrolled in the SDTP program, Dr. Bruce opines that he would have received appropriately targeted treatment for his PTSD, rather than treatment that was more focused on his substances abuse, a symptom of his PTSD. Finally, Dr. Allen directly addresses the Government's theory that William's suicide was caused by impulsivity and alcohol

---

[105]*Id.* at 310.

[106]As previously discussed, the police report from the night of William's suicide is inadmissible hearsay and thus cannot be used by the Government to demonstrate a lack of causation.

abuse that can be separated from his PTSD symptoms and rejects it. As already discussed, these experts carefully reviewed William's medical records and other record evidence in this matter in reaching their opinions.

Second, Plaintiff points to Corey's testimony that William continued to have flashbacks after his January treatment. The Government questions the weight of this evidence, pointing to Corey's failure to remember the exact dates on which these flashbacks occurred. But on summary judgment the Court views the evidence in the light most favorable to Plaintiff, and does not weigh conflicting evidence. Taken in the light most favorable to Plaintiff, Corey's testimony demonstrates that William indeed continued to suffer from combat flashbacks after he was discharged in January, until the date of his death. This evidence directly controverts the Government's assertion that William was happy, healthy, and sober between the time of his discharge and the date of his death, creating a genuine issue of material fact about whether Plaintiff was experiencing PTSD symptoms at the time of his death.

There is a fundamental issue of fact in this case about whether William committed suicide due to alcohol abuse and impulsivity, but was otherwise handling his PTSD symptoms prior to his death, or to the contrary, whether he continued to struggle with PTSD, which in turn led to suicidal thoughts, impulsivity, and alcohol abuse. The experts disagree. Because the controverted facts, when viewed in the light most favorable to Plaintiff, could lead a reasonable trier of fact to conclude that William's suicide was the direct result of the VA's negligence, summary judgment must be denied.

**IT IS THEREFORE ORDERED BY THE COURT** that the Government's Motion to Exclude Testimony Pursuant to *Daubert* (Doc. 132) is **denied**.

**IT IS FURTHER ORDERED** that the Government's Motion for Summary Judgment

(Doc. 130) is **denied**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion for Leave to File Sur-reply (Doc.

143) is **granted**.

**IT IS SO ORDERED.**

Dated: August 15, 2017

S/ Julie A. Robinson
JULIE A. ROBINSON
UNITED STATES DISTRICT JUDGE
