## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

DONALD DRAUGHON,

     Plaintiff,

     v.                                   Case No. 14-2264-JAR

UNITED STATES OF AMERICA,

     Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiff Donald Draughon brings this Federal Tort Claims Act ("FTCA") wrongful death action against the United States of America, alleging the Veterans Health Administration ("VA") was negligent in treating his son William Draughon ("William"), which ultimately led to his suicide. This case was tried to the Court beginning on January 3, 2018. This decision represents the Court's findings of fact and conclusions of law as required by Fed. R. Civ. P. 52. As described more fully below, the Court finds in favor of Plaintiff and directs him to file an affidavit setting forth his notice efforts as required by Mo. Rev. Stat. § 537.095.1, no later than March 23, 2018.

## I.    Findings of Fact

Cpl. William P. Draughon ("William") was born on October 12, 1981. William's parents divorced when he was young. Starting at about age seven, his father, Plaintiff Donald Draughon, and his stepmother, Laurie Draughon, obtained full custody of him and his younger brother Corey. William attended North Kansas City High School, where he was very involved in wrestling and football. Friends and family describe him as funny, well-liked and happy, and they insist that he did not have any issues with behavior or substance abuse. According to his ex-wife Jennifer Campbell, who was also his high school sweetheart, William experimented with alcohol

and marijuana, but did not drink to excess in high school.  Donald recalls an incident when he found beer at William's sixteenth-birthday party and they argued; William hit him.  According to Donald, this was an isolated incident, and William was apologetic.

William enlisted with the United States Marine Corps in February 2001, when he was nineteen years old.  After deployments to Japan, Australia, and Afghanistan, William returned to the United States and married Campbell.  She moved to San Diego to be with him.  In early 2004, William deployed for a seven-month combat tour in Iraq that ended on or around October 2004.  William was a squad leader and gunner during his tour in Iraq.  He was exposed to fire fights, improvised explosive devices ("IED"), grenades, and land mines.  Several members of William's squad died during his tour in Iraq, and he expressed feelings of guilt and responsibility for their deaths and having kept their dog tags on the rearview mirror of his truck.  William talked to Corey about how he struggled with his role as a gunner during the war, and about the things he was required to do to stay alive.   Similarly, William expressed to Campbell over the phone when he was in Iraq that he was struggling with the deaths of his squad members, and with killing civilians.

William received a citation for heroic service, and was honorably discharged in February 2005.  Campbell, Corey, and Donald and Laurie Draughon all testified that William was a changed man when he returned from Iraq.  He was depressed, short-tempered, avoided crowds, and was quiet, reserved, and distant.  He suffered from nightmares and was easily startled.  He would have sleeping binges, and then disappear for days.  They also noticed him drinking to excess for the first time.  Glenn Hamby, who served in the Marines with William, described him

upon return as different: "[U]p until the time we deployed, I never once seen Will as an angry person. I've never seen him mad ever. And when we got home he was different."[1]

William was diagnosed as having posttraumatic stress disorder ("PTSD") at the time of his discharge from military service. In February 2005, William expressed his intention to seek help from the VA for disability and for his PTSD. On at least two occasions in 2005, William was violent with Campbell, at one point attempting to strangle her during an episode when he apparently believed he was in combat. By July 5, 2005, Campbell decided to leave him. The divorce became final in December 2005.

By the fall of 2005, William had a brief relationship with Andrea Brightwell that ended in early 2006. They lived together, and she became pregnant with his child. Brightwell testified that William drank consistently, and would sneak out and not return home on the weekends. She recalled one incident when William sat up in bed in the middle of the night in a trancelike state. She also recalled William sitting in his truck staring at the dog tags he kept of the deceased squad members he lost in Iraq. Brightwell knew William had been diagnosed with PTSD at that time. William and Brightwell's daughter, R.B., was born in September 2006, but prior to 2010, Brightwell would not allow William to spend time alone with her due to his drinking.

Plaintiff called Dr. Steven Bruce as an expert on PTSD. Dr. Bruce is a clinical psychologist who runs his own trauma clinic that serves individuals suffering from PTSD, including many veterans. His primary area of research is PTSD, and he has been extensively published on the topic over the last twenty-four years. He has also worked in two different VA hospitals in their PTSD units. Dr. Bruce explained that PTSD occurs when there are changes to the brain associated with trauma. It usually involves three clusters of symptoms: (1) re-

---

[1]Hamby Dep., Doc. 177 at 20:17–22.

experiencing symptoms, such as reminders, flashbacks, and nightmares; (2) hyperawareness

symptoms, such as difficulty sleeping and hypervigilance when in public; and (3) avoidance

symptoms—efforts to avoid talking and thinking about the underlying trauma.  Often, the

avoidance symptoms lead to alcohol use; 50% of people with PTSD also have a substance abuse

disorder.  In veteran samples, Dr. Bruce explained the percentage is closer to 75%.  PTSD can

cause impulsive behavior, and can ultimately lead to suicide.  Dr. Bruce cited a study that

compared individuals who experienced trauma and those who have not, finding that those with

PTSD have a 34% suicide rate.  PTSD is not a diagnosis based on overt symptoms; the vast

majority of symptoms are internal.  Precipitators, or natural day-to-day stressors, can trigger

PTSD symptoms, which often lead to impulsive behavior because PTSD decreases a patient's

ability to use normal coping strategies for these precipitators.

It is therefore difficult for non-mental health professionals to see overt signs of PTSD.

Dr. Michael Allen, who works with patients at risk for suicide, and with veterans suffering from

PTSD, testified that PTSD symptoms typically increase and decrease periodically.  They may

become more manageable, but they continue at some level indefinitely.  Laypersons do not have

the education necessary to recognize PTSD symptoms.

Dr. Bruce acknowledged that the order for treating individuals with both PTSD and a

comorbid condition like substance abuse can be difficult to determine, and that it would be

important to try to discern the root cause of the patient's symptoms.  The VA's Clinical Practice

Guidelines for the Management of Post-Traumatic Stress supports this conclusion:

> Patients with PTSD frequently use alcohol and other substances in
> maladaptive ways to cope with their symptoms.  (Approximately
> 40 to 50 percent of PTSD patients treated in the VA have current
> substance use problems . . . .)  Effective PTSD treatment is
> extremely difficult in the fact of active substance use problems
> unless substance use[] disorders are also treated.  Most often,

> attempts to address substance problems should proceed
> concurrently with the direct management of PTSD.  However, in
> cases when the substance use is severe, substance use may require
> initial treatment and stabilization before progressing to PTSD care
> (e.g., patient requires detoxification from opiates) . . . .[2]

Between February 2005 and August 26, 2009, William attended mental health appointments at the Veterans Affairs Kansas City, Missouri Medical Center ("KCVA") on five occasions: August 4, 2005; April 7, 2008; December 16, 2008; January 20, 2009; and March 31, 2009.  When William began mental health treatment at the KCVA in August 2005, he reported having severe guilt about loss of his troops under his command; being transiently suicidal; hearing sounds in his head such as explosions, choppers, screaming; being hyper alert; and "SI [suicidal ideation] present."[3]  William repeatedly reported to his VA healthcare providers that he was drinking more since he returned from Iraq, and he believed that he was self-medicating with alcohol.  His PTSD screens were positive at his appointments in 2006 and 2008.

In 2007, William reported a history of exposure to IED, grenades and land mines, after which he was dazed and confused.  On April 7, 2008, William reported recurring combat nightmares and insomnia. He reported that "he has been abstaining all ETOH – still very tremulous/anxious" and there was a "positive PTSD screen."[4]  On March 31, 2009, William told his VA psychiatrist, Dr. McKnelly, that he struggled with the April 6–7 anniversary of losing some of his buddies in Iraq, and that he always drinks heavily on those dates.  Dr. McKnelly noted during this appointment that William suffered from PTSD.

William started dating Denise Cumberland in November 2007, and they lived together for a few months in early 2008.  They broke up after William assaulted her, but then got back

---

[2]Ex. 85 at B-23 ¶ 2.

[3]Ex. 12 at USA_00681.

[4]*Id.* at USA_664–65.

together briefly.  Cumberland became pregnant, and their son, D.C., was born in November 2009.  Although Cumberland was unaware of William's PTSD diagnosis until after his death, she witnessed some of the same behavior described by other close family members and friends—he drank excessively and only talked about how upset his experience in Iraq made him after a night of extensive drinking.  In April 2008, Cumberland discovered a rope with a noose at the bottom hanging from their basement ceiling.  According to Laurie Draughon and Campbell, William had no relationship with D.C. after he was born in the summer of 2009.

On August 27, 2009, William drank alcohol to excess, dressed in camouflage, blackened his face, and wielded a knife.  His girlfriend at this time, Jennifer Moran, called the police when she awoke to find him standing next to the bed, talking softly while holding the knife.  William ran from police throughout his neighborhood, at one point laughing at them.  He eventually woke up inside his dog house.  The next morning, a friend took him to the KCVA, where he was admitted for a period of hospitalization between August 28, 2009 and September 2, 2009.  William reported that this drinking binge the prior evening was triggered by him finding some medals and newspaper articles about the war.

During this hospitalization, William admitted to suicidal ideation "off and on recently with thoughts of shooting himself or going off a bridge."[5]  He admitted to thinking of harming himself, and that he had a plan.  He reported that "he was driving his truck last night 'very fast and looking at something to crash into.'"[6]  William reported that he had "horrible PTSD symptoms," including intense flashbacks of his friends dying, and "things that he had to do during the war."[7]  He reported drinking heavily to self-medicate.  William told a nurse, a social

---

[5] *Id.* at USA_00627.

[6] *Id.* at USA_00598.

[7] *Id.*

worker, and a VA psychiatrist about two previous suicide attempts: (1) a few months earlier, he

held a gun to his head and pulled the trigger, but it missed him; and (2) several weeks earlier, he

carried a loaded gun around his house, told everyone to leave him alone, drank alcohol, and

overdosed on his medication.  His girlfriend found him unresponsive, and he was taken to

another hospital and treated.

The VA has a procedure in place for identifying patients at high risk for suicide.  It

contains "carefully defined criteria for high risk suicide" and references the warning signs and

high-risk criteria described in the "Suicide Risk Assessment Guide Reference Manual."[8]  The

Suicide Risk Assessment Guide Reference Manual includes a list of nonexhaustive factors that

may increase or decrease a person's risk for suicide.  While these factors are statistically related

to suicidal behavior, "[t]hey do not necessarily impart a causal relationship."[9]  Some of the risk

factors on this list are:

> • Current ideation, intent, plan, access to means
> • Previous suicide attempt or attempts
> • Alcohol/substance abuse
> • Current or previous history of psychiatric diagnosis
> • Impulsivity and poor self-control . . . .
> • Recent losses—physical, financial, personal
> • Recent discharge from an inpatient psychiatric unit . . . .
> • Co-morbid health problems, especially a newly diagnosed
>   problem or worsening symptoms . . . .[10]

Protective factors that may decrease a person's risk for suicide include:

> • Positive social support
> • Spirituality
> • Sense of responsibility to family
> • Children in the home, pregnancy
> • Life satisfaction
> • Reality testing ability

---

[8]Ex. 76.

[9]*Id.* at 8.

[10]*Id.* at 9.

- Positive coping skills
- Positive problem-solving skills
- Positive therapeutic relationship[11]

At the time William was admitted to the KCVA in August 2009, VHA Directive 2008-036 was in place: "Use of Patient Record Flags ["PRF"] to Identify Patients at High Risk for Suicide."[12]  The directive explains that "[t]he primary purpose of the High Risk for Suicide PRF is to communicate to VA staff that a veteran is at high risk for suicide and the presence of a flag should be considered when making treatment decisions."[13]  This flag appears in the patient's electronic medical record when any health care provider accesses the record.  The VA directive makes clear that

> The use of any PRF is restricted to addressing immediate clinical safety issues.  As such, it is important to ensure that usage of a PRF is limited to only those patients at high risk, and only for the duration of the increased risk for suicide.  The PRF is removed as soon as it is clinically indicated to do so.  This is especially important to minimize the risk of undue stigmatization for the patient, and to maintain the value of the PRF system as an alert to immediate clinical safety concerns.[14]

The directive further explains that whether a veteran is determined to be at high risk for suicide "is always a clinical judgment made after an evaluation of risk factors (e.g., history of past suicide attempts, recent discharge from an inpatient mental health unit), protective factors and the presence or absence of warning signs as listed on the VA Suicide Risk Assessment Pocket Card."[15]

---

[11] *Id.*

[12] Ex. 77.

[13] *Id.* ¶ 2(a).

[14] *Id.* ¶ 2(b).

[15] *Id.* ¶ 2(d)(2).

VA Suicide Prevention Coordinators were provided with further guidance about their responsibilities in an April 24, 2008 Memorandum from the Principal Deputy Under Secretary for Health and Deputy Under Secretary for Health for Operations and Management, with the subject line "Patients at High-Risk for Suicide."[16]  The memo requires SPCs to report certain patients as high risk.  Among other requirements:

> Patients, who are admitted for hospitalization as a result of a high-risk for suicide ideation, must be placed on the high-risk list, and kept on the list for a period of at least 3 months after discharge. They must be evaluated at least weekly during the first 30 days after discharge.  Other patients identified as surviving a suicide attempt and those who are placed on the high-risk list for other reasons should also be evaluated at least weekly for at least the next month.[17]

The policy outlined in the April 24, 2008 memo also requires that SPCs "contact the veteran's primary care and/or mental health provider to ensure" they have a care plan including monitoring for suicidality and periods of increased risks.  This plan must include specific processes of follow-up for missed appointments.  In addition, there must be a written safety plan with specific features outlined in the policy, including a list of "situations, stressors, thoughts, feelings, behaviors and symptoms that suggest periods of increased risk, as well as step-by-step descriptions of coping strategies and help-seeking behaviors that can be used at these times."[18]

In addition, the VA's patient record flag directive provides that a facility's suicide prevention coordinator is responsible for, *inter alia*: "Assessing the risk of suicide in individual patients, in conjunction with treating clinicians," "[e]nsuring that patients identified as being at high risk for suicide receive follow-up for any missed mental health and substance abuse appointments in conjunction with the clinical treatment team, and that this follow-up is

---

[16]Ex. 78.

[17]*Id.* ¶ 4.

[18]*Id.* ¶ 5(f)(1).

documented in the medical record," and "[m]aintaining a list of patients who currently have a flag, and establishing a system of reviewing these flags at least every 90 days."[19]

During the August 28 through September 2, 2009 period of hospitalization, William's suicide risk assessment screen was positive, and VA Suicide Prevention Coordinator Cherie Durkin set a high-risk flag for suicidal behavior in his electronic record on August 28, 2009.  The medical note states:

> Veteran is being added to the facility's High Risk List for Suicidal Behavior due to reported behaviors on Aug 28, 2009 requiring an immediate treatment plan change such as hospitalization. Veteran's electronic records will be reviewed in 90 days for evidence of continued or resolved risk factors, warning signs, and protective factors to consider continuance or removal from the High Risk list.[20]

Durkin testified at trial about her role in and the guidelines for setting and removing the high-risk flag.  She had no recollection of William's case, but testified that her role in setting this high-risk flag was "clerical."  She did not personally examine him, or exercise any clinical judgment in setting the flag.

On August 31, 2009, the VA staff provided William with information about the Substance Abuse Residential Rehabilitation Treatment Program ("SARRTP") for after his discharge, which is offered at the KCVA.  SARRTP is a 28-bed residential rehabilitation program for treating substance abuse disorders, and provides services for "co-occurring medical conditions, mental illness, and psychosocial deficits."[21]  While there is voluntary PTSD programming available through this program, it is neither concentrated nor required.

---

[19]Ex. 77 at 5.

[20]*Id.* at USA_00604.

[21]Ex. 79 at 1.

On September 1, 2009, VA staff provided William with information about the VA's

Stress Disorders Treatment Program ("SDTP") in Topeka.  This program is offered to "veterans

and active-duty soldiers who have experienced military-related trauma (e.g. combat trauma,

military sexual trauma, other traumatic assaults) that has led to [PTSD], depression, substance

abuse, and other life difficulties."[22]  It is a seven-week, twenty-two bed "intensive inpatient

program designed to help veterans decrease symptoms, improve their quality of life, enhance

self-esteem, return to work or school, and reintegrate with their families and communities."[23]

Admission to the program requires thirty days of sobriety, although it does include treatment

programs targeting substance abuse.  There is typically a two-week to three-month waiting

period for the program, due to high demand and low availability.

Most of the treatments available in the SDTP program are also available to patients on an

outpatient basis through the KCVA, but the SDTP program offers it on an inpatient, concentrated

basis.  The SDTP program includes what Dr. Bruce deems "gold standard" evidence-based

treatments for PTSD: Cognitive Processing Therapy ("CPT"), and in vivo, which is sometimes

called Prolonged Exposure ("PE").  CPT involves writing out the events that happened to a

veteran, and how it changed their life.  In session, the patient reads the description repeatedly,

and tries to challenge the generalizations behind their dealings with people based on those

traumatic experiences.  PE is similar, but the patient orally recounts the trauma repeatedly in

multiple sessions.  This type of therapy targets the avoidance symptoms associated with PTSD.

On September 2, 2009, the date of his discharge, a VA psychologist strongly encouraged

William to pursue admission to the SDTP program and provided him with informational

materials, including an application.  The SDTP application required applicants to write down

---

[22]Ex. 86 at 2.

[23]*Id.*

their traumatic experiences in detail.  Although William expressed a desire "to enter the program ASAP," he had not attained thirty days of sobriety by September 2.  The psychologist also informed William of VA psychologist Dr. George Dent's PTSD Education and Symptom Management Group that meets weekly.

As of September 9, 2009, William was planning to attend the SDTP program in Topeka if accepted.[24]  On September 16, 2009, VA staff psychiatrist Thomas Demark, M.D. examined Plaintiff for the first time, and referred William to Dr. Dent for talk therapy.  Dr. Demark works in the PTSD outpatient clinic at the KCVA.  He and one other psychiatrist managed a caseload of between 2000 and 3000 patients, along with a team of psychologists, social workers, and other staff.  On September 30, 2009, William met with Dr. Demark again, and reported an incident that week when he went out drinking at a bar, drove home, and was verbally abusive to his girlfriend.  William had stopped taking his medication, and did not remember the events from that evening.  On October 2, 2009, William met with a VA Suicide Prevention case manager, and expressed his continued interest in the SDTP program, but indicated he was not ready to fill out the application.

William was hospitalized again at the KCVA again from October 4, 2009 until October 7, 2009.  On October 4, 2009, at 2:09 a.m., the Kansas City Police Department brought William to the KCVA emergency room, because "[a]pparently he ha[d] medication today and began having flashbacks," and was positive for alcohol.  The prior evening, William had been drinking around a campfire with a friend, talking about the war.  William reported suicide ideation and was admitted for "mood and medication management and [alcohol] detox."[25]  While at the hospital, William rammed his head into a Plexiglas window, and had to be restrained by officers.  On

---

[24]Ex. 12 at USA_0536.

[25]*Id.* at USA_00521.

October 4, he admitted to suicidal thoughts, and that he had a specific plan of driving his car into a bridge.

William told VA providers on October 5, 2009, that he wanted to attend SARRTP because his girlfriend would not let him return home without seeking help. At the time of discharge, Plaintiff was scheduled to follow-up with Dr. Demark 90 days later on January 7, 2010. He was admitted to SARRTP the day after discharge. Dr. Amalia Bullard was William's VA psychologist in the SARRTP program. She met with William twice during the program, addressing both substance abuse issues and PTSD. Because 30–50% of veterans in the program have PTSD, some treatment for that condition is also provided in SARRTP, including medication management, individual therapy with Dr. Bullard, and group therapy such as "Seeking Safety."[26] During his meetings with Dr. Bullard, William told her he was experiencing "horrible PTSD symptoms," including flashbacks, anger and nightmares, and told her that he drinks heavily to "self-medicate" his PTSD.[27]

Dr. Bullard determined that William's primary diagnosis was alcohol abuse, and his secondary diagnosis was PTSD. Accordingly, Dr. Bullard believed that the VA should treat William's alcohol dependence before tackling intensive PTSD treatment so that it would create more stability for his eventual PTSD treatment. Dr. Bullard's PTSD therapy with William focused on symptom management such as grounding, deep breathing, and medication management. She also testified that group therapies were offered to William in SARRTP to help target triggers and teach coping skills, including twelve-step education, and "Seeking Safety."

---

[26]Several medical providers testified about this type of integrated group therapy for PTSD and substance abuse. Dr. Bruce indicated that only two pilots had been conducted in 2014 and 2016 on this treatment, and that the data from those two trials showed extremely limited results as supportive therapy.

[27]Ex. 12 at USA_00435.

Dr. Bullard testified that she may suggest SDTP treatment for certain patients even if they have an active substance abuse disorder; however, it would depend on their readiness and motivation to work through the trauma. Dr. Bullard testified that it was typical for veterans to struggle with filling out the SDTP application, and that it was not uncommon for her to help veterans complete the application. But whether a veteran could complete the application helped her determine whether to recommend them for the program. Dr. Bullard believed that if they cannot complete the SDTP application, it often demonstrates their lack of readiness to participate in the difficult trauma processing therapy offered through SDTP. This explains why, despite making an appointment with William on October 20, 2009, for the purpose of helping him fill out his SDTP application, nothing in the note from that appointment indicates she in fact helped him complete the application.

Dr. Bullard believed William required further stabilization of his substance abuse disorder in order to benefit from PTSD treatment, and she did not believe that he was ready for trauma processing therapy offered at SDTP. She testified that although the SDTP program required only 30 days sobriety, 90 days is best. Dr. Bullard believed the Psychiatry and Addiction Recovery Treatment ("PART") Program at the Leavenworth VA in Kansas was the next appropriate step for William. PART was a seven-week, dual-diagnosis program that treated about twenty-five veterans with both a substance-abuse disorder and a mental health condition, which would get William closer to the 90-day sobriety mark that Dr. Bullard believed was best before entering the SDTP program.

On October 15, 2009, in between Dr. Bullard's two individual appointments with William, a VA social worker provided him with an application for the PART program. On October 22, 2009, William reported to VA Psychiatrist Dr. Lee that he decided to apply to the

PART program.  William was discharged from SARRTP on October 28, 2009, having maintained his sobriety during the length of the program and having learned basic coping skills to manage his cravings to drink.

William attended PART at the Leavenworth VA from November 18, 2009 until January 6, 2010.  By the time he began PART, he had been sober for 30 days.  At PART, William received individual and group therapy, although it was not specialized PTSD treatment.  His goal for the program was to learn how to remain clean and sober and to ready himself for the SDTP program; it was common for veterans to attend PART before SDTP.  Dr. Raul Huet was William's psychiatrist in the program, tasked primarily with his medication management.  William first met with Dr. Huet on November 19, 2009.  At this appointment, Dr. Huet characterized many of William's reported PTSD symptoms as extreme.  He noted William's passive suicide ideation, meaning he was having thoughts that life was not worth living, on an almost daily basis.  He also noted William's depression, frequent nightmares, feelings of alienation, hypervigilance, and sense of a foreshortened future.  William told him that he had not gotten out of bed in the last two weeks, and cited financial difficulties as a current stressor.  Dr. Huet's primary diagnosis was PTSD, along with major depressive disorder and alcohol dependence.  Although Dr. Huet acknowledged at trial that William believed he was self-medicating the PTSD symptoms with alcohol, he testified that instead he believed the two conditions were related, noting a genetic component to William's alcohol dependance.

William felt that he was getting a lot out of the PART program, and believed he was making progress, although he still struggled with talking about his wartime traumas.  On November 23 and 24, 2009, William expressed a desire to go to SDTP following PART, but he had not yet completed his application.  Dr. Jenny Rosinski was William's PART psychologist

who met with him at least weekly.  She explained that PART adapted dialectical behavioral

therapy, which is normally utilized to help treat bipolar disorder, to treat PTSD patients.  Several

times during William's stay at PART, Dr. Rosinski assisted William in completing his SDTP

application.

On December 2, 2009, ninety days after William was discharged from his first

hospitalization at the KCVA, Durkin removed the high-risk flag from William's electronic

medical record.  Durkin initially testified that her role in removing the flag, like her role in

adding it, was purely clerical.  She stated that when a high-risk patient approached the ninety-day

point, she would send a blue-colored form to the primary provider, in this case Dr. Demark,

along with a list of guidelines she created for determining whether a patient should remain on the

high-risk list.  Durkin could not remember whether she asked for any health care provider to

review and approve these guidelines:

1.  F/u post discharge after psychiatric admission or phone
conversation with a provider or SPC staff weekly for first
month.
2.  Continue on prescribed medications
3.  No hospitalization for MH issues within the 90 day period
post DC
4.  No reports of misuse of medications within the 90 period
post DC
5.  No reports of misuse of medications within the 90 day
period post DC
6.  No further attempts or suicidal high risk behaviors within
the 90 day post DC
7.  Overall clinical stability

PLEASE ENSURE THAT THERE IS AN APPOINTMENT SET
FOR VETERAN IF FLAG IS TO BE CONTINUED.[28]

The note was signed by Durkin and acknowledged by Dr. Demark.  Dr. Demark testified that he

would normally receive the blue sheet in his box, which would ask "yes" or "no," if he would

---

[28]Ex. 81 (duplication of items 4 & 5 in original).

maintain the flag, and if no, to state why. According to Durkin, the VA has destroyed all paper forms from this time period in an effort to transition to electronic patient files, so there is no evidence that this form was completed for William, nor the contents of the form.

Durkin eventually asked to correct her trial testimony that her role in removing the flag was purely clerical. Despite having no specific recollection of William's case, she asserted that she would have reviewed William's file before removing the flag. She then proceeded to identify parts of William's medical record that justified her decision to remove the flag. The Court does not credit this later inconsistent testimony, and instead finds that no VA provider exercised clinical judgment in removing the high-risk flag. The Court believes Durkin's initial testimony that her role was merely clerical, which was consistent with her earlier deposition testimony. Dr. Demark has no specific recollection of making or reviewing the decision to remove the flag and testified that it was Durkin's job to determine whether a patient should remain on the high-risk list. Dr. Demark stated that if he saw the note that the flag was to be removed, and he disagreed or viewed it to be in error, he would have changed it.

By December 21, 2009, William reported that he believed he was ready for the SDTP program now, and hoped to "figure out how to live with PTSD better."[29] On December 22, he told Dr. Huet that he was still waiting to hear back regarding his admission to SDTP, and hoped to hear soon. On December 23, he discussed financial assistance options with a VA social worker if he attended SDTP, including references to community resources and organizations that could assist with his monthly bills during the duration of this treatment at SDTP.

On December 28 and 29, 2009, William reported to his providers that he was doing well, his medication was working well, and he was not having nightmares. Techniques he learned in

---

[29]Doc. 131-2 at USA_00194–95.

treatment were helping him identify his triggers. William had been accepted into the SDTP program, but told providers that he had decided not to go directly into that program after discharge from PART, but rather, work for a period to earn money first. William feared foreclosure on his home that he shared with Moran and his brother, Corey. Based on his receiving a 10% disability rating for his PTSD, his disability benefits were insufficient to meet his financial obligations. By the time William was discharged from PART, he had been in residential treatment programs through the VA for the better part of three months. Dr. Rosinski discussed other treatment options with William that he could take advantage of after discharge.

On December 29, 2009, Dr. Huet administered a PCL screening test for PTSD, which is an oral questionnaire about a patient's PTSD symptoms. Dr. Bruce testified that this test is administered to determine whether a patient has significant PTSD symptoms, to track a patient's progress during treatment, and to determine the appropriate follow-up care on discharge. The range of scores is between 17–85. In this setting, any score over 50 was considered positive. The time period measured can vary from one week to one month, depending on the provider, but Dr. Bruce opined that frequent screens based on the prior week is most appropriate while in residential treatment. He further opined that using a 30-day measure before discharge defeats the purpose of using the screen as a tool to mark progress. Nonetheless, Dr. Huet performed the December 29 PCL test by asking William to provide responses based on the last thirty days. William's score on December 29 was recorded as 42, or "negative."

On January 4, 2010, William met with Dr. Huet and reported that he was doing well and had no cravings for drugs or alcohol. He denied being suicidal or planning self-harm. On January 6, 2010, the day of William's discharge from the PART program, an addendum was added to his record that the previous PCL screen was for the wrong patient and the accurate

report for William was 65, or "positive," and reflected different answers to the questions as those reflected in the original December 29 screening. According to Dr. Bruce, the difference between a score of 65 and 42 is "everything." In his practice, he considers a score of anything over 64 extreme, and would caution a medical provider against discharging a patient with this score.

Dr. Huet learned of the PCL notation error on January 6. He testified that it was not his practice to discuss PCL scores with his patients, and that the PCL score was more of a reflection of William's symptoms at the beginning of the PART program when his symptoms were more severe, citing his instruction to William to answer the questionnaire based on his symptoms over the last thirty days. Dr. Huet's own clinical judgment based on more recent appointments with William was that his PTSD symptoms were significantly improved. Dr. Huet further testified that although William was stable at the end of the PART program, and that he did not consider him to be at high risk of suicide, William understood Dr. Huet's diagnosis that he had PTSD, and that it was serious. Dr. Rosinksi concurred with Dr. Huet's view, adding that William's PTSD severity was not any more severe than other veterans she had worked with in PART. Even considering the amended PCL score, Dr. Huet viewed his discharge treatment plan as sound. His discharge instructions provided William with information about the emergency room and walk-in services, directed him to follow up with Dr. Demark the following day, January 7, and follow up with Dr. Dent within one to two weeks, he was to attend SMART recovery, and he planned to attend the SDTP program as soon as he caught up with his house payments. Dr. Huet reviewed the nine medications William was taking with him.

Neither Dr. Huet nor Dr. Rosinksi played a role in the decision to remove William from the high-risk list, and there is no evidence that they were asked to weigh in, despite being William's primary caregivers when the decision was made. Nonetheless, Dr. Huet testified that

he did not believe William was at high risk for suicide by the end of the PART program—by that time, Dr. Huet believed William's condition had improved considerably.

Had William remained on the high-risk list at the time of his discharge from PART, VA policy would have required his mental health provider to ensure that William had a care plan that "includes ongoing monitoring for suicidality and plans for addressing periods of increased risk. These plans must include specific processes of follow-up for missed appointments."[30]  He would have been evaluated at least weekly for the first 30 days after his discharge from PART.[31] Additionally, a VA Directive in place at the time of William's discharge provided that "Patients with emergent or urgent medical needs must be provided care, or be scheduled to receive care, as soon as practicable."[32]  "Urgent care" under this directive "includes the follow-up appointment for a patient discharged from a Department of Veterans Affairs (VA) medical facility, if the discharging physician directs that the patient must return on a specified day for the appointment."[33]

All of William's treating providers and the medical experts testified that William's first follow-up appointment after his discharge from PART on January 7, 2010 with Dr. Demark, was an important appointment.  He was ready to address his PTSD problems, having achieved a lengthy period of sobriety, and he had just been discharged from a lengthy residential treatment program.  The Court credits Dr. Allen's testimony that this was an especially high-risk time for William, having just completed a total of ten weeks in inpatient care in a protective environment,

---

[30] Ex. 78 ¶ 5(c).

[31] *Id.* ¶ 4.

[32] Ex. 68 at 9 ¶ (19)(a).

[33] *Id.* at 1 ¶ 2(e)(2)(a).

while managing nine different medications.  Also, Dr. Demark testified that he most likely would have discussed the amended PCL score with William at the January 7 appointment.

William cancelled his January 7 appointment with Dr. Demark; there is no evidence about why.  Dr. Demark acknowledged receipt of William's PART discharge on January 8, 2010, but his office made no effort to reschedule the appointment.  The VA Directive on outpatient scheduling provides that "[a] patient currently or formerly in treatment for a mental health condition, who requests to be seen outside of the clinician desired date range, needs to be seen or contacted within 1 working day by the treatment team for evaluation of the patient's concerns."[34]  And when the clinic cancels an appointment, or a patient fails to appear for a scheduled appointment, the medical records need to be reviewed to determine whether urgent medical problems need to be addressed, provisions need to be made for medication renewals, and to determine whether the patient needs to be rescheduled as soon as possible.[35]  On January 12, 2010, Dr. Rosinski called William to "follow up with him regarding how he has done with the transition home from the PART program."[36]  She left him a voicemail and asked him to call her back.  This outreach was memorialized in the medical record.

William had indicated to Dr. Rosinksi on the date of his discharge from PART that he wanted to schedule his own follow-up appointments with Dr. Dent, and Dr. Rosinski therefore did not schedule a follow-up with him.  Dr. Dent acknowledged receipt of Dr. Rosinski's discharge note on January 11, 2010, and contacted William sometime after that in January to arrange a follow-up appointment because Plaintiff had not yet contacted him.  During that call, Dr. Dent asked how William was doing, and William denied any suicide or homicide ideation.

---

[34]*Id.* at 10 ¶ (19)(g).

[35]*Id.* at 10 ¶ (19)(k)–(l).

[36]Ex. 12 at USA_00146.

Dr. Dent scheduled follow-up appointments for William with himself and Dr. Demark on April 2, 2010. He testified that setting an appointment out this far was "wildly atypical" for him, and thinks he would have suggested an appointment within one month, however he could not recall what options he provided to William. Nonetheless, Dr. Dent set the follow-up appointments on this date based on William's willingness and availability, and based on William's statements that he was not suicidal or homicidal. Dr. Dent does not recall exactly what else he discussed with William during this phone call, but is certain he would have told William that he had the option to walk-in for follow-up care sooner than April 2. Dr. Dent did not view this telephone conversation as significant enough to notate in the medical record.

William's next VA medical record shows that on March 5, 2010, he attended an appointment with his primary care physician, Dr. James Walterbach. At this appointment, William reported no alcohol or drug use in the past five months, that he was doing better, and that he had some job opportunities. A drug and alcohol screen confirmed no alcohol or drugs in William's system on that date. Dr. Walterbach was not alerted during this appointment to any emergent mental health issues with William, although he did not conduct a suicide screening or discuss PTSD symptoms with him.

Other evidence about William's circumstances between January 6, 2010, and the date of his death on March 18, 2010, demonstrates that he continued to suffer from PTSD symptoms, and that he eventually relapsed with alcohol. His brother Corey lived with William during this time, sleeping in a bedroom directly below him. He testified that William continued to suffer from nightmares and flashbacks after his discharge from PART, and that the medication he was prescribed "knocked him out." He testified that William slept a lot, and did not want to see many people. During one flashback, he ran through the house and told Corey to "flank" the front

of the house.  Laurie testified that she and Donald did not see that much of William between January and March; she suspected Moran was urging him to stay away from them.  She thought he seemed distant.  Although Laurie did not witness him drinking, she saw beer cans and bottles in the garage of his house, and had been told that he was drinking again.  Brightwell, William's former girlfriend and the mother of his daughter, testified that when she saw William briefly in early March 2010 to drop off their daughter, he seemed to her happy and excited to have his daughter for the weekend.  He told her he quit drinking.  But she admitted that her interaction with him was brief, and that when she asked him to watch their daughter on St. Patrick's Day, he declined, telling her that he had plans with Moran.  One week before his death, Hamby spoke to William on the phone for approximately four hours.  Hamby thought he sounded depressed, and William complained of PTSD symptoms, and expressed dissatisfaction with his treatment at the VA.  William told him that his PTSD was interfering with his relationship with Moran, his home, and his family.  William was worried about his ability to provide for his family.  Hamby thought he was close to convincing William to move to Minnesota to try seeking treatment through the VA there; he had hoped after the St. Patrick's Day holiday William would finally agree to move.

By all accounts, William was proud of his Irish heritage and enjoyed celebrating St. Patrick's Day.  On March 17, 2010, he and Moran decided to go out to Tanner's Bar and Grill. William invited Corey to join them, but he declined and stayed home.  William and Moran drank alcohol; William drank beer to excess.  While they were at the bar, Moran noted an incoming text message on William's phone from "Lindsy from Singles.net."  William told her that the text message was not for him, but they began to argue.  When they arrived home, they were still arguing and William smashed his cell phone on the front steps while Moran unlocked the door. Corey was sleeping downstairs when they arrived home, and he heard them yelling.  After

Moran entered the house, she saw William walk out of his bedroom with a handgun in his right hand, holding it to the side of his head. She screamed for Corey and tried to push the gun away from William, but William shot himself in the head just as Corey reached the top of the stairs. William died at about 1:30 a.m. on March 18, 2010, from a self-inflicted gunshot wound to the head. At the time of his death, his blood alcohol level was four times the legal limit.

William's death devastated his family and friends. Although those close to William were aware of his PTSD and substance abuse challenges, they did not witness behavior in the days leading up to March 17 that gave them reason to think he would take his own life. Donald Draughon in particular experienced emotional distress in the wake of William's suicide. He testified about the guilt he experiences knowing William used his weapon to commit suicide; a firearm that Donald was not aware William had taken. He and Laurie testified about the pain they experienced on the night of the suicide when the police arrived at their door and took Donald to William's house. They testified about the intensely emotional reaction they both experienced upon learning of his death. They testified about the pain and suffering they have experienced since that time. Donald testified that he spent about five years in a deep depression, during which time he spent days at a time in bed, and was unable to work. He has recovered with the help of therapy and faith.

The Draughons spent $11,814.42 on William's funeral expenses.[37] In the years between his discharge from the Marines and death, William worked intermittently as a plumber and for Sam's Club. Often, his periods of unemployment were due to a lack of available work, but William repeatedly claimed to struggle with keeping jobs due to his PTSD symptoms. Plaintiff offered expert witness Thomas Ireland, Ph.D., a forensic economist, to testify about lost financial

---

[37]Ex. 136. Plaintiffs requested $25,500 in funeral expenses in the Pretrial Order, but the Court cannot find record support for that figure.

support for William's two children after his death. His opinion is based on a child support order issued to William before his death for R.B. Based on these calculations, Dr. Ireland contends that she would be entitled to $75,278 by the time she reaches the age of eighteen. Dr. Ireland assumed the same payments to William's son, in a total amount of $83,382 by the time he turns eighteen. During cross-examination, Dr. Ireland conceded that there was an arrearage reflected in the child support order for R.B., which he carried through for the entire pay period for both children. He estimates that his calculations should be reduced by 10% if the arrearage is not included. Although there was no child support order issued for D.C., Dr. Ireland assumed that D.C. would be entitled to the same amount of support as William's other child, and that the child support order represents the best estimate of the support to which he would be entitled if William was still alive. Dr. Ireland explained that because the majority of a decedent's earnings would be used to support himself, the child support orders represent the amount of money that would be passed on to each child.

## II.    Conclusions of Law

The Court has subject matter jurisdiction under 28 U.S.C. § 1346(b)(1) over Plaintiff's FTCA claim. The Court has personal jurisdiction over the United States, and venue properly rests with this Court.

When a plaintiff brings suit against the United States under the FTCA, the source of law is "the law of the place where the act or omission occurred."[38] The Court has already determined that Plaintiff's claim arises under Missouri law.[39] To state a wrongful death claim on a theory of negligence under Missouri law, Plaintiff must establish the following elements at trial: "(1) the defendant owed a duty of care to the decedent; (2) the defendant breached that duty; (3) the

---

[38]28 U.S.C. § 1346(b)(1); *Flynn v. United States*, 902 F.2d 1524, 1527 (10th Cir. 1990).

[39]*See* Doc. 33.

breach was the cause in fact and the proximate cause of his death; and (4) as a result of the breach, the plaintiff suffered damages."[40]  The standard of care generally must be established by expert testimony.[41]  Plaintiff bears the burden of proving liability by a preponderance of the evidence, which means "that which is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows the fact to be proved to be more probable than not."[42]

Under Missouri law, to demonstrate causation in a wrongful death case, "a plaintiff must show that the negligence of the defendant 'directly caused' or 'directly contributed to cause' the patient's death."[43]  In the context of suicide, Plaintiff must be able to offer evidence of proximate causation—that "suicide was 'the natural and probable consequence' of the injury he suffered at the hands of the defendant."[44]  Such evidence will require expert testimony if there is no other direct evidence of causation presented.[45]  The Missouri Supreme Court has cited with approval modern psychiatric scholarship supporting "the idea that suicide is sometimes a foreseeable result of traumatic injuries."[46]  If Plaintiff produces evidence "that the suicide resulted from the

---

[40]*Heffernan v. Reinhold*, 73 S.W.3d 659, 665 (Mo. Ct. App. 2002).

[41]*See, e.g.*, *McLaughlin v. Griffith*, 220 S.W.3d 319, 320–21 (Mo. Ct. App. 2007).

[42]*See Motley v. Colley*, 769 S.W.2d 477, 478 (Mo. Ct. App. 1989) (citing *Fujita v. Jeffries*, 714 S.W.2d 202, 206 (Mo. Ct. App. 1986)).

[43]*Kivland v. Columbia Orthopaedic Grp., LLP*, 331 S.W.3d 299, 306 (Mo. 2011) (en banc) (quoting *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 865 (Mo. 1993) (en banc) (alterations omitted)).

[44]*Id.* at 309 (quoting *Callahan*, 863 S.W.2d at 865).

[45]*Id.*

[46]*Id.* at 308–09 (citing Allen C. Schlinsog, Jr., *The Suicidal Decedent: Culpable Wrongdoer, or Wrongfully Deceased*, 24 J. Marshall L. Rev. 463, 479, n.76 (1991), and Gabriel Ryb E., M.D. et al., *Longitudinal Study of Suicide After Traumatic Injury*, 61 J. Trauma 799 (2006) (finding that suicide is more common for trauma patients than for the general population, particularly with increased age, for white male trauma patients, for trauma patients having a positive alcohol toxicology and for trauma patients suffering from disability resulting from the trauma)).

injury, the claim then can be submitted to the jury to decide as a question of fact, whether the suicide is a direct result of the defendant's negligence."[47]

Plaintiff alleges myriad ways the VA breached the standard of care in this case, but during closing argument, Plaintiff's counsel correctly distilled these into three general breaches: (1) failing to timely refer William to specialty PTSD treatment; (2) removing William from the list of patients at high-risk for suicide; and (3) failing to adequately follow-up with William after his discharge from PART. The Court follows Plaintiff's lead and addresses whether Plaintiff has proved by a preponderance of the evidence his wrongful death claim under each of these three theories.

### A.    Specialty PTSD Treatment

Plaintiff was first diagnosed with PTSD in 2005, but this lawsuit alleges that the VA breached the standard of care for treating patients like William suffering from both PTSD and a comorbid substance abuse disorder when it failed to timely refer him to specialty PTSD treatment in late 2009. Specifically, Plaintiff claims that the VA should have recommended Plaintiff participate in the SDTP program after he achieved 30 days of sobriety in late November 2009, instead of recommending the seven-week PART program, that was geared toward treating his substance abuse disorder. Plaintiff claims that William's primary diagnosis was PTSD, and that his substance abuse was a symptom of that PTSD, therefore, the VA should have made greater efforts to treat his PTSD. Plaintiff points to evidence in the record that William's drinking increased substantially after he returned from Iraq, that he drank to self-medicate his PTSD symptoms, and cites Dr. Bruce's opinion that once a patient's PTSD symptoms improve, studies show that substance abuse improves as well. Dr. Bruce also testified that the VA's

---

[47]*Id.* at 310.

failure to better aid William in completing his SDTP application was a breach in the standard of care; he disagreed with the many VA treating providers' testimony that William's failure to fill out the application was an indicator that he was not ready for intense PTSD treatment. And Dr. Bruce disagreed with the VA treating providers' opinion that a period of sobriety longer than 30 days was ideal in William's case.

The Court gives credence to Dr. Bruce's opinion that the VA placed too much emphasis on the SDTP application, and that the VA overemphasized Plaintiff's substance abuse treatment in the aftermath of his acute hospitalizations in October 2009. The Court also gives credence to Dr. Bruce's opinion that CPT and PE represent "gold standard" treatments for PTSD. Nonetheless, the Court cannot find that the standard of care in place at the VA at this time required William's providers to recommend specific PTSD treatment such as CPT, or PE, in his case, or required referral to SDTP. Dr. Bruce's testimony did not establish that these treatments, in the case of a patient with a comorbid substance abuse disorder, represent the governing standard of care. Instead, his testimony established an expression of his own practices, which differ from the practices at the VA.

All of William's treating physicians, as well as the Government's medical expert Dr. Ticknor, testified that they believed the PART program was a better treatment option for William in November 2009, as compared to SDTP. They hoped that PART would prepare William for SDTP. Dr. Bullard, who treated William in SARRTP, testified that while she sometimes would recommend that a PTSD patient with substance abuse issues enter SDTP at thirty days of sobriety if she felt that the patient was ready, she did not believe William was such a case. Instead, she viewed substance abuse stabilization as his priority. Dr. Huet and Dr. Rosinski testified that it was common for PTSD patients who suffered from both disorders to attend PART

28

before SDTP.  Dr. Rosinksi believed the PART program was the best fit for William given his extreme avoidance symptoms, as evidenced by his inability to complete the SDTP application. She believed that substance abuse stabilization, coupled with dialectical behavior therapy and medication management, was a necessary predicate for the SDTP program.  Indeed, the PART providers ultimately helped William apply to SDTP, and secured his admission directly after he discharged from PART.  William instead opted to discharge himself due to financial difficulties.

Under Missouri law, "[a]s long as there is room for an honest difference of opinion among competent physicians, a physician who uses his own best judgment cannot be convicted of negligence, even though it may afterward develop that he was mistaken."[48]  On the issue of specialty PTSD treatment, the Court finds that there is an honest difference of opinion among competent physicians, and that Dr. Bruce's opinion on the standard of care in this instance reflects his own practices, as opposed to the standard of care in the medical profession.  The VA providers' decision to more aggressively treat William's substance abuse is supported by VA policy guidance.  The VA's Clinical Practice Guidelines for the Management of Post-Traumatic Stress acknowledged the difficulty of treating both diseases, stating "[e]ffective PTSD treatment is extremely difficult in the face of active substance use problems unless substance use[] disorders are also treated."[49]  Several doctors, including Dr. Bruce, acknowledged in their testimony the "chicken and egg" problem inherent in treating comorbid disorders such as these—all such providers attempt to determine the root cause of the problem and start there.  Here, the VA providers' decision to ensure William's substance abuse disorder had stabilized was in line with VA policy.  The Court finds there is an honest difference of opinion in the medical

---

[48]*Albanna v. State Bd. of Registration for Healing Arts*, 293 S.W.3d 423, 432 (Mo. 2009) (en banc) (quoting *Haase v. Garfinkel*, 418 S.W.2d 108, 114 (Mo. 1967)).

[49]Ex. 85 at B-23.

community about whether the standard of care dictated that the VA focus first on William's substance abuse treatment through PART, instead of his PTSD treatment through SDTP. Therefore, the Court finds in favor of the Government on this theory of relief.

**B.    High-Risk Suicide List and Flag**

The parties do not dispute that William was properly flagged as a patient at high risk for suicide on September 2, 2009, during his first acute hospitalization at the KCVA. Durkin admitted that her role in setting the flag was clerical, and testified that she did not personally examine William, or exercise any clinical judgment in setting the flag. Nonetheless, the evidence at trial showed that he tested positive on a suicide risk assessment, and that he presented with several of the risk factors identified by the VA that qualified him as a high-risk patient. These risk factors included current ideation, intent, plan, access to means; previous suicide attempt or attempts; alcohol/substance abuse; current or previous history of PTSD and other psychiatric disorders; impulsivity and poor self-control; and worsening co-morbid health problems with his PTSD and substance abuse.

The Court credits Dr. Allen's testimony on the standard of care for maintenance of the high-risk list. In his own clinical practice, Dr. Allen evaluates patients with intermittent suicide risks daily. He is the director for the State of Colorado's suicide hotline, and he testified that he is familiar with the standard of care that applies to patients experiencing suicidality, including those with PTSD. He explained the importance that there be a clinical review prior to placing or removing a patient flag. As Dr. Allen explained, there is no record that explains the basis of the VA's decision to remove the high-risk flag for William on December 2, 2009—no risk assessment was completed. Dr. Bruce agreed, testifying that the standard of care requires that a provider physically examine a patient before removing from the high-risk list.

Durkin's note setting the high-risk flag indicated that it would be reviewed ninety days after discharge "for evidence of continued or resolved risk factors, warning signs, and protective factors to consider continuance or removal from the High Risk list." This is in line with the VA guidance on maintaining such flags.[50] The flag was removed exactly ninety days after it was set, on December 2, 2009, without explanation. This, coupled with the dearth of evidence that any clinician examined William, or reviewed his file before determining that the flag should be removed, is strong evidence that no provider exercised clinical judgment in removing the flag. Durkin used an unofficial list of factors to be considered when reviewing a patient's high-risk designation. As Dr. Bruce and Dr. Allen testified, a review of William's medical record on December 2, 2009, would have revealed several risk factors on both the VA's list and Durkin's list continued to be present, and that protective factors did not mitigate those risks. William was hospitalized and exhibited high-risk behaviors within ninety days after his discharge from the first acute hospitalization on September 2. He was re-hospitalized from October 4–7, 2009, after intense flashbacks and a drinking binge. While at the hospital, William rammed his head into a Plexiglas window, and had to be restrained by officers. On October 4, he admitted to suicidal thoughts, and told providers that he had a specific plan of driving his car into a bridge. Despite the high-risk flag requiring a safety plan to be in place at that time, the contents of that safety plan are not included in the medical record. There is nothing to indicate that the VA worked with William to ensure he did not have access to firearms during this period, which had been involved in several acute PTSD episodes, and at least one prior suicide attempt.[51]

---

[50]*See* Ex. 77.

[51]On September 16, 2009, William told Dr. Demark that he "gave all his guns to his father," in the context of his psychiatric history. Ex. 12 at USA _532, 626–27. On September 10, 2009, Suicide Prevention Case Manager Karlene A. Newsom entered a note that "Treatment/Suicide Safety Plan was created with Pt.'s input and Pt was given a copy at discharge." *Id.* at USA _597. The safety plan itself is not in evidence, nor is there any testimony about its contents.

On November 19, William reported passive suicide ideation, and complained about depression, explaining that he had not gotten out of bed for two weeks.  William had several prior suicide attempts that year, a substance abuse disorder, and he was on a significant list of medications.  Although William had shown improvement while in PART, Dr. Allen explained that this is to be expected in a protective environment such as a domiciliary treatment program.  Also, Plaintiff had declined SDTP treatment upon discharge because he was having financial problems, and believed he needed to discharge in order to work and avoid foreclosure on his home.  While it is true that some protective factors were present, such as a supportive family, and a better understanding of coping skills, there is no indication that these protective factors outweighed the many serious risk factors present on December 2, 2009, and on January 6, 2010.  Plaintiff has demonstrated that under the VA's own criteria, William should not have been removed from the high-risk list.

Moreover, VA policy and all expert testimony make clear that the standard of care requires the exercise of clinical judgment when removing a patient from the high-risk list.  As described above, Plaintiff has demonstrated by a preponderance of the evidence that no VA provider exercised independent clinical judgment when removing William from this list.  The Court has considered Durkin's inconsistent testimony about whether her role was merely clerical, and discounts her attempt to change that testimony and claim that she exercised clinical judgment.  She has no specific recollection of William's case, and did not examine him.  Similarly, Dr. Demark has no recollection of signing off on the decision to remove William's high-risk flag, and testified that it was Durkin's job to remove a person from the list, although he insists that if he had disagreed with its removal, he would have objected.  Notably, neither Dr.

Huet nor Dr. Rosinski, who were treating William in the PART program at another VA location, were copied on or consulted about the flag.

Dr. Allen also testified that whenever there is a significant change in status, such as discharge from a domiciliary program like PART, a patient's suicide risk should be reassessed because the period after discharge from such a program is a well-known high-risk period. There is no record that any suicide assessment was completed upon William's discharge from PART.

The Court further finds that Plaintiff has demonstrated by a preponderance of the evidence that the VA's breach in removing him from the high-risk list directly contributed to cause William's death by suicide. Had William remained on the high-risk list at the time of his discharge from PART, VA policy would have required his mental health providers and the suicide prevention coordinator to ensure that William had a care plan that "includes ongoing monitoring for suicidality and plans for addressing periods of increased risk. These plans must include specific processes of follow-up for missed appointments."[52] He would have been evaluated at least weekly for the first 30 days after his discharge from PART.[53] The Court credits Dr. Allen and Dr. Bruce's expert opinions that the failure to maintain William on the high-risk list, which would have triggered aggressive follow-up care and safety planning, created a high probability that his condition would deteriorate, he would abuse alcohol, and he would become suicidal again. The Court finds that William's high suicide risk was reasonably foreseeable to VA providers at the time the flag was removed on December 2, 2009, and on discharge from PART on January 6, 2010.

---

[52] Ex. 78 ¶ 5(c).

[53] *Id.* ¶ 4.

C.    **Follow-up Care**

Finally, Plaintiff argues that the VA owed him a duty of better follow-up care upon his discharge from PART, that would have substantially decreased his risk for suicide.  Specifically, Plaintiff alleges the following breaches: (1) charting the wrong PCL score before William's discharge, and then failing to correct the mistake until the date of discharge or discuss with the patient; (2) failing to monitor William for ninety days after discharge; (3) failing to evaluate William weekly for the first thirty days after discharge, provide a care plan for missed appointments, a written safety plan, or high-risk monitoring; (4) failing to contact William within one day of him cancelling his January 7, 2010 appointment; (5) failing to review William's medical records after his January 7 cancellation; and (6) permitting William to reschedule his January 7 appointment for April 2.

The Court has already found by a preponderance of the evidence that the VA breached the standard of care by removing William from the high-risk list in December 2, 2009.  If William was still on that list at the time of his discharge from PART, certain follow-up requirements would have defined the standard of care that should have applied to him.  He would have received ongoing monitoring, a written safety plan, and a process for missed appointments. Additionally, a December 17, 2009 VA Directive in place at the time of William's discharge provided that "Patients with emergent or urgent medical needs must be provided care, or be scheduled to receive care, as soon as practicable."[54]  This directive applied to William since he was discharged from the VA Leavenworth facility and was directed to follow-up on a specific date.  His follow-up appointment should have been scheduled as soon as practicable.  William was rescheduled for April 2, three months after his cancelled appointment.  Another requirement

---

[54]Ex. 68 at 9 ¶ (19)(a).

in this directive on follow-up appointment procedures applied to William, because he was "formerly in treatment for a mental health condition," and requested to be seen outside of the date range specified by Dr. Huet—the next day for Dr. Demark and one to two weeks for Dr. Dent. Under the directive, William should have been seen or contacted within one working day by someone from his "treatment team for evaluation of the patient's concerns."[55] Also under this directive, the medical records should have been reviewed to determine whether urgent medical problems needed to be addressed, provisions needed to be made for medication renewals, and whether William needed to be rescheduled as soon as possible.[56] There is no evidence that this happened.

The Court also weighs heavily Dr. Allen's testimony that a follow-up appointment one week after discharge was the standard of care that applied to William. All of William's treating providers testified that William's first follow-up appointment after his discharge from PART on January 7, 2010 with Dr. Demark, was an important appointment. He was ready to address his PTSD problems, having achieved a lengthy period of sobriety, and he had just been discharged from a seven-week domiciliary treatment program, and before that a three-week residential treatment program. Dr. Allen testified that this was an especially high-risk time for William. Dr. Allen also pointed to the nine different medications William was prescribed upon discharge, and opined that it was important to follow up and manage those medications.

The Government's reliance on Exhibit 63 does not undercut Dr. Allen's opinion on follow-up care. Exhibit 63 is a report commissioned by the Suicide Prevention Resource Center in collaboration with the Substance Abuse and Mental Health Services Administration from 2011—published the year after William's death—entitled "Continuity of Care for Suicide

---

[55]*Id.* at 10 ¶ (19)(g).

[56]*Id.* at 10 ¶ (19)(k)–(l).

Prevention and Research."  That publication corroborates Dr. Allen's testimony that the period after discharge from an inpatient care program is a high-risk period.  It states that "long waits for a first outpatient appointment can be deadly."[57]  It goes on to explain that there is no nationally "recognized standard of care that defines timeliness that applies to this critical time period."[58]  The Government pointed to this statement out of context during Dr. Allen's testimony and relied on it to argue that there is no standard of care that applies to the time period after discharge that a patient with suicide risks should receive an initial follow-up appointment.  But the report goes on to explain that while there is no explicit best practices protocol, such as one week, other field organizations have "perpetuat[ed] minimally acceptable standards of care."[59]  Here, as already explained, the VA recognized the need upon discharge for William to be seen by his psychiatrist the day after discharge, and by his psychologist within one to two weeks after discharge.  Dr. Allen opined that had this initial discharge plan held, it would have met the standard of care.  However, scheduling out William's first follow up almost three months later clearly exceeded even a minimally acceptable standard of care under the VA's own stated policies.

On January 8, 2010, one day after the scheduled appointment, Dr. Demark acknowledged receipt of the PART discharge plan, which included his January 7 appointment with William.  Yet, neither Dr. Demark, nor anyone else on the treatment team contacted William when he cancelled.  Dr. Dent eventually called William on the phone sometime in mid-January since William had not arranged for an appointment with him yet.  Dr. Dent found this phone call to be so insignificant that it did not merit a notation in the medical record.  Although Dr. Dent asked William during this mid-January phone call if he was suicidal or homicidal, he did not perform a

---

[57]Ex. 63 at 115.

[58]*Id.*

[59]*Id.*

suicide risk assessment.  He did not discuss the extreme PCL score that had been corrected on January 6, and its implications for follow-up care.  He does not recall communicating to William the importance of follow-up care in general, even though William had cancelled his first follow-up appointment after discharge from almost three months of inpatient treatment, which followed a period of extremely high-risk behavior.  Instead, Dr. Dent scheduled what he described as a "wildly atypical" appointment almost three months later, on April 2.  He recalls this date being William's choice, although he has no recollection about why; he has no recollection of the details of the conversation at all.  The VA's failure to make any effort to schedule follow-up care for William sooner than three months after his discharge from PART fell well below the standard of care that applied, as described in the VA's policy and by Plaintiffs' experts.

The Government asserted at trial that the decision to follow-up in April was William's decision, and the standard of care did not require his providers to force him into follow-up care sooner.  There are several problems with this argument.  First, it contradicts VA policy on cancellations and follow-up care after discharge, which required a member of William's treatment team to review his medical record, and then follow-up with him within one working day to determine the reason for the cancellation and reschedule the appointment.  Second, there is a wide spectrum of conduct between setting out an appointment on any date a patient chooses, and seeking police intervention—an extreme option Dr. Bruce discussed during his testimony that may apply when a doctor believes a patient presents an extreme risk of suicide and will not agree to be seen.  It is true that there is no evidence to suggest that Dr. Bruce's worst case scenario was warranted in this case.  But Plaintiff has shown by a preponderance of the evidence that the VA made little to no effort to convince William that follow-up care before April was

integral to his continued mental health, particularly given the high-risk period following discharge, his operative PCL score, and his history of suicidal behavior.

The only effort to discuss follow-up care with William after his discharge on January 6 was Dr. Dent's phone call.[60]  Plaintiff has demonstrated by a preponderance that this phone call was brief and involved little substance—Dr. Dent did not view it as meaningful enough to notate in the medical record and has no recollection of any efforts he made to persuade William to reschedule his appointment before April.  Given the many facts pointing to William's period of risk after discharge: his PCL score, multiple prior suicide attempts coupled with a lack of safety plan, financial hardship, recent sobriety, and recent discharge from a protected inpatient mental health program, the VA should have made a greater effort to persuade William to be seen sooner. As Dr. Allen testified, often an attempt by a medical provider to impress upon the patient the importance of follow-up care is sufficient without the need for extreme measures such as police intervention. While it is true that a patient has a shared responsibility to attend follow-up care, the VA recognizes in their policies that patients often do not take control of their care and it has an obligation to try to provide care to patients who most need it.

Finally, the Court finds by a preponderance of the evidence that the VA's breach of the standard of care in its follow-up of William after his PART discharge directly contributed to his suicide.  The Court gives great weight to Dr. Allen and Dr. Bruce's testimony on causation, which was powerful.  Dr. Bruce testified that the many warning signs that required follow-up care for William created a "tsunami" that led to his suicide.  He convincingly testified that William's suicide was more probable than not due to this lack of follow-up care, and that it is surprising to him that it did not happen sooner than March 18.  Similarly, Dr. Allen testified that

---

[60]Although Dr. Rosinski attempted to contact William, the note indicates it was for purposes of checking in on his transition, not for ensuring he received follow-up care.

the departures in the standard of care drove William's suicide risk, and that intervention would have more likely than not prevented his suicide.  He testified that had Dr. Dent or Dr. Demark requested or encouraged William to continue his care and keep up the momentum he began at PART, it would have had a protective effect and prevented his death.  In his opinion, William's suicide was both predictable and preventable.

In making these findings on breach and causation, the Court is unpersuaded by Dr. Ticknor's contrary opinions for several reasons.  First, Dr. Allen and Dr. Bruce's clinical experience and expertise in the areas of suicidality and PTSD far exceed Dr. Ticknor's more generalized clinical experience and research work, which in recent years has been reduced by half as he increased his time spent working as an expert witness.  He considers himself an expert on PTSD, stating that he has treated "hundreds if not thousands" of PTSD patients in his 35 years of treatment, but this was not his specialty.  He has not published any work on these topics.  In contrast, Dr. Bruce has dedicated his entire practice to the treatment of PTSD, and is extensively published on that topic.  Similarly, Dr. Allen's practice and research specializes in managing suicide risk, and he has vast experience treating veterans experiencing heightened risk of suicide due to PTSD.  Further, the Court credits Plaintiff's experts' rebuttal opinions that Dr. Ticknor relied too heavily on lay witness testimony to formulate his opinions that William's suicide was not caused by his untreated PTSD, the failure to place him on the high-risk for suicide list, and the lack of follow-up care.

The Court further agrees with Plaintiff's experts that Dr. Ticknor too quickly dismissed the importance of follow-up care after William completed PART.  Dr. Ticknor opined that the only relevant facts bearing on causation were the events directly preceding William's suicide on March 18, 2010, and that those facts demonstrated his suicide was caused by alcohol and an

argument with his girlfriend.  But as Dr. Allen explained, William and Moran's argument was a precipitant, and William's vulnerability from PTSD and alcoholism going into that event prohibited him from processing the precipitant in the way someone would without those underlying, untreated conditions.  Moreover, the Court is not persuaded by Dr. Ticknor's reliance on the police report from the night of William's suicide.  Moran's account of her argument with William is entirely consistent with Plaintiff's experts' opinion that William's untreated PTSD, as exacerbated by his use of alcohol, caused him to commit suicide that night in response to the precipitant argument with her.  Similarly, the Court is not convinced by Dr. Ticknor that William's alcoholism and substance abuse began in high school and independently caused his impulsivity and suicidal behavior.  As described in detail in the Court's findings of fact, although William drank alcohol on occasion prior to his tour of duty in Iraq, there is no evidence of a pattern of drinking to excess until he returned, and the medical evidence points to a clear symbiotic relationship between his drinking, and his PTSD.

Moreover, lay testimony about William's condition between discharge and his suicide contradicts Dr. Ticknor's opinion.  While it is true Donald said that William was "good to go" after he visited the Draughon home the day before his suicide, this hardly contradicts Corey's testimony that William's flashbacks and nightmares persisted after his discharge, and that he was heavily medicated, which "knocked him out."  Moreover, Hamby testified that William was struggling with PTSD symptoms and that William expressed his dissatisfaction with the treatment he had received from the VA.  Laurie suspected William was drinking again.  Dr. Ticknor's contention that Corey's testimony was not corroborated does not find support in the record.  Accordingly, as described above, the Court finds by a preponderance of the evidence

that the VA's myriad breaches of the standard of care that applied to William's follow-up

treatment after discharge from PART directly contributed to cause his death.

### D.    Damages

This action is governed by the Missouri Wrongful Death statute, Mo. Rev. Stat. §

537.080.  Under this provision,

> 1. Whenever the death of a person results from any act, conduct, occurrence, transaction, or circumstance which, if death had not ensued, would have entitled such person to recover damages in respect thereof, the person or party who, or the corporation which, would have been liable if death had not ensued shall be liable in an action for damages, notwithstanding the death of the person injured, which damages may be sued for:
> (1) By the spouse or children or the surviving lineal descendants of any deceased children, natural or adopted, legitimate or illegitimate, or by the father or mother of the deceased, natural or adoptive;
>
> . . . .
>
> 2. Only one action may be brought under this section against any one defendant for the death of any one person.

Here, William's father filed suit and is the only named Plaintiff in this action.  Nonetheless,

Missouri law provides that any one person entitled to sue under this provision may recover

damages without joinder,

> provided that the claimant or petitioner shall satisfy the court that he has diligently attempted to notify all parties having a cause of action under section 537.080.  Any settlement or recovery by suit shall be for the use and benefit of those who sue or join, or who are entitled to sue or join, and of whom the court has actual written notice.[61]

Recovery under the wrongful death statute by Donald Draughon therefore must include all

persons entitled to share in the proceeds, and the Court must make an apportionment

---

[61]Mo. Rev. Stat. § 537.095.1.

determination "among those persons entitled thereto in proportion to the losses suffered by each as determined by the court."[62]

The Court is aware that William's father, Plaintiff Donald Draughon, and William's children, R.B. and D.C., are entitled to recover under § 537.080. Nonetheless, Plaintiff has not satisfied the Court by written notice that he diligently attempted to notify all parties having a cause of action under the wrongful death statute, as required by § 537.095.1. Therefore, before entering judgment and an award of damages in this matter, the Court directs Plaintiff to submit an affidavit to the Court by March 23, 2018, sufficient to satisfy his notice obligation under Mo. Rev. Stat. § 537.095.1. Upon receipt of this affidavit, the Court will enter a supplemental order under Fed. R. Civ. P. 52, awarding and apportioning damages based on the evidence presented at trial.

**IT IS SO ORDERED.**

Dated: February 23, 2018

S/ Julie A. Robinson
JULIE A. ROBINSON
CHIEF UNITED STATES DISTRICT JUDGE

---

[62]Mo. Rev. Stat. § 537.095.3.